**Velda Joyce STINSON**

v.

**TENNESSEE DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION, et al.**

**Civ. No. 79–3246.**

United States District Court,
M.D. Tennessee,
Nashville Division.

April 30, 1982.

Final Order Dec. 21, 1982.

Carol L. McCoy, Farrell & McCoy, Robert Belton, Nashville, Tenn., for plaintiff.

R. Stephen Doughty, Asst. Atty. Gen., Nashville, Tenn., for defendants.

## MEMORANDUM

JOHN T. NIXON, District Judge.

A non-jury trial of this matter was held on September 24, 25, and 26, 1980 and January 28 and 29, 1981, at which time the Court received testimony and documentary evidence from the parties.

Plaintiff, Velda Joyce Stinson, is a female employee of the Middle Tennessee Mental Health Institute [MTMHI], a treatment facility run by the Tennessee Department of Mental Health and Mental Retardation [TDMHMR]. Plaintiff holds a Doctorate Degree in Public Administration obtained in 1977 from Nova University. She also holds a Master's Degree in Public Administration, a Master's Degree in Psychology, and an R.N. Degree.

Dr. Stinson sued TDMHMR, MTMHI, Dr. James Brown [Commissioner of TDMHMR] and Dr. James Willett [Superintendent of MTMHI] on May 18, 1979, alleging deprivation of rights secured to her by Title VII of the Civil Rights Act of 1964, as amended [42 U.S.C. § 2000e, *et seq.*], Title VI of the Civil Rights Act of 1964, as amended [42 U.S.C. § 2000d], and Tenn.Code Ann. § 50–320. The individuals were sued in both their official and individual capacities.

On December 28, 1979, this Court ordered that plaintiff's claims under Title VI and Tenn.Code Ann. § 50–320 be dismissed, and further dismissed all claims against Dr. Brown and Dr. Willett in their individual capacities. Dr. Stinson subsequently amended her complaint to allege discrimination declared unlawful by Title IX of the Educational Amendments Act of 1972 [20 U.S.C. § 1681].

## BACKGROUND

In 1977, defendant, MTMHI, was reorganizing its management and administration. Under new reorganization of administration and management, a programmatic concept was developed. Four divisions were created. They were: (1) Administrative Services; (2) Professional Services; (3) Clinical Services and (4) Residential Services. Under the last division, that of Residential Services, eight programs were set up which rendered direct services to patients. These programs were Extended Care Treatment, Children and Youth, Geriatrics Diagnostic and Acute Treatment, Forensic Services, Medical Surgical, Drug and Alcohol Abuse and T.N.I. These eight programs provide direct care for patients living on or off the Institute's grounds, while the three other divisions were to complement and coordinate with these programs and their need. For instance, Administrative Services provide housekeeping, laundry, escort services and security services for patients, while also handling personnel matters, accounting, procurement and other administrative duties necessary to operate a facility for the mentally ill. Clinical Services was available for patients

to receive medical or dental care on the facility's grounds. Professional Services provided professional consultants to the Program Directors to assist them in setting up their programs, caring for patients, and to provide them with in-service training for the nurses and technicians who worked directly with the patients and the programs. Professional Services also was charged with the duty to evaluate the quality of the service and care rendered to the patients and to report to the other administrators where improvements were necessary. Finally, Professional Services provided pastoral services, adjunctive therapy and volunteer services, all of which dealt directly with the patients in the eight programs.

## FINDINGS OF FACT

Plaintiff Velda Joyce Stinson is a qualified health professional. She holds a license as an R.N., an M.A. in Psychology and Public Administration and a Ph.D. in Public Administration. In the past, she has worked with local, state and federal health service programs. In 1971, she began to work for the State of Tennessee at the University of Tennessee-Nashville as a faculty member. She was appointed to the Metropolitan Board of Hospitals and ran unsuccessfully for public office in 1976. Prior to and directly after her unsuccessful race, she was employed as a supervisor of research by the defendant in its Central Office in downtown Nashville.

In April 1977, plaintiff applied for the position of Assistant Superintendent for Administrative Services at MTMHI, and was interviewed by Dr. James Willett. Dr. Willett was the new Superintendent at the Institute, even though he soon retired and, during his tenure there, was in poor health. He recommended to Commissioner Harold Jordan that Dr. Stinson be hired. His decision was overridden by Commissioner Jordan and the Assistant Commissioner, Samuel Peipers, both of whom indicated they wanted their own candidate, a male, John Vaughn, to be given the position of Assistant Superintendent for Administrative Services. Upon learning of Mr. Vaughn's selection, Dr. Stinson wrote Dr. Willett about her concern at being passed over and asked where her qualifications were weak. Dr. Stinson testified that she was unaware as to why she had been rejected for the position until after discovery in this lawsuit had been initiated.

Rather than reply in writing, Dr. Willett called and offered plaintiff a similar, although newly created, position of Assistant Superintendent for Professional Services. She accepted and both Commissioner Jordan and Assistant Commissioner Peipers concurred in that appointment on May 1, 1977. The only remaining administrative position, that of Assistant Superintendent for Residential Services, was filled in August 1977, with the appointment of Leon Joyner, upon the recommendation of Assistant Commissioner Peipers. Mr. Joyner had an M.A. in Public Administration and had been Dr. Peipers' assistant at the Central Office prior to his appointment.

When Mr. Joyner arrived in August 1977, the administrative appointments under the new reorganizational plan were completed. Dr. Luton, the Assistant Superintendent for Clinical Services, was a licensed physician, but his health was quite poor, and he died prior to this action being filed. He did not play an active role in any of the actions complained of by plaintiff.

In August 1977, the Institute was also preparing for an accreditation team from the Joint Committee on Accreditation of Hospitals [JCAH] for an inspection to determine if, for the first time ever, the Institute would be an accredited hospital.

As the new Assistant Superintendent for Professional Services, plaintiff worked to set up her division and to coordinate with the eight programs, to give guidance and direction to her employees and to assist in obtaining accreditation for MTMHI. Plaintiff's exact duties and responsibilities were never clearly defined although she repeatedly attempted to discover what they were. Her first inquiry on July 5, 1977, was a three page memo which was ignored by Dr. Willett. In that memo, plaintiff asked him for direction and guidance in

trying to define the role, scope and authority of the several components under Professional Services.

"What, at first glance, appears to be a relatively simple problem is really a complex and difficult one when subjected to a more careful analysis. Presently, there are no documents that provide definition of the Institute's major divisions ... During several meetings with my staff, these questions have come up repeatedly. We feel that the definitions we have asked for are fundamental to the development of Institute policy and procedures. Further, without them, Professional Services cannot fully develop its major services which are so important during our preparation for accreditation. I am eager to work with you as you wish to resolve these matters and I look forward to hearing from you in the near future." (Plaintiff's Exhibit 9, 7-5-77).

Both oral and written requests by the plaintiff to Dr. Willett frequently went unanswered. On March 20, 1978, plaintiff wrote Dr. Willett that Professional Services was critically short of clerical help to prepare records, etc., for accreditation and asked for the full cooperation and help of the Department of Personnel under Mr. Vaughn. Dr. Willett did not reply orally or in writing and took no action. (Plaintiff's Exhibit 9, 3-30-78).

On March 30, 1978, plaintiff again wrote Dr. Willett to ask if she and her directors could meet with him to discuss the setting of priorities of programs due to staff shortages. Dr. Willett did not reply orally or in writing and took no action. (Plaintiff's Exhibit 9, 3-30-78).

On April 10, 1978, plaintiff wrote Dr. Willett to repeat the problem of supervision for the consulting psychologist, Ron Check, who was failing to submit reports on his activities. Dr. Willett did not respond orally or in writing and took no action. Dr. Check testified that on one occasion at a staff meeting, plaintiff made mention of his failure to turn in reports and he was somewhat surprised, maybe even slightly embarrassed, by her comment. Other than this

comment, Dr. Check had no major complaints about Dr. Stinson and thought they got along well. It should be noted that this instance was carried by Irene Herder, Dr. Check's immediate supervisor, to Dr. Willett (who was not present at the staff meeting). This comment was used by Dr. Willett as an example of the unfair criticisms plaintiff made of her employees. Dr. Willett never discussed the comment with Dr. Check nor with the plaintiff. (Plaintiff's Exhibit 9, 4-10-78).

On April 11, 1978, plaintiff wrote Dr. Willett that all the staff needed TB testing and asked him to send a memo to the various program directors encouraging them to send new employees for such tests and to have tested employees find out their results. Dr. Willett did not reply orally or in writing and took no action. (Plaintiff's Exhibit 9, 4-11-78).

However, given the programmatic concept, plaintiff and her staff were not only involved in setting up programs to evaluate the quality of care at the Institute under the new reorganizational plan, more importantly, they were preparing many of the reports, standards, guidelines and evaluations for the eight programs which would be necessary to acquire accreditation when the survey team arrived at the Institute. Her staff had to compile documentation of proper audits, of records that proper dosages of medication were being administered to patients, that new employees had adequate training in patient care and that the standards by which all of the programs could be evaluated were in existence and that the programs had been evaluated. These tasks had to be coordinated with the other divisions.

In the fall of 1977, plaintiff discovered that her staff was encountering various problems in attempting to conduct their work. Technicians from the eight programs were not attending classes in the Learning Resource Center [LRC], patients' records were incomplete, bacterial counts were high in coffee pots and water coolers used by the staff and patients. Some employees were lax or haphazardly performing

their duties. As noted above, Ron Check repeatedly failed to turn in activity reports to his supervisor, Irene Herder. Harold Hughes, Director of Adjunctive Therapy, was frequently late to work, failed to turn in reports after many requests by plaintiff and would not cooperate with other directors in the Department.

At the Executive Committee Meetings, plaintiff voiced these problems and lack of cooperation to the other administrators but received no assistance from any of the men, particularly Dr. Willett. Informal resolution of many administrative problems was much easier for the male administrators than for plaintiff because, for no other reason, of the physical location of the administrative offices. The offices of the Superintendent and the Assistant Superintendents were located on the First Floor of the Farmer Building at MTMHI. The suite of administrative offices were arranged in such a fashion that the men had offices which shared common walls and doors and/or reception areas while plaintiff was physically segregated to another area with her own secretary. While both Mr. Joyner and Mr. Vaughn testified that plaintiff had a larger, perhaps nicer office, her isolation and segregation were the two factors that impaired her ability for informal resolution of problems. The only access plaintiff had to the men's offices was through the main hallway, rather than the interoffice connection available to the male administrators. Annette Burns, secretary to Dr. Willett, testified that the three male administrators frequently met informally in one another's offices, would drop in to see each other during the day, while plaintiff was required to make appointments to see any of them, rather than just dropping in. Since plaintiff was new to the Institute, just as the other administrators were, she did not complain about personal inconveniences or the difference in treatment for over one year because she felt that it was better to work toward improving the Institute rather than pointing out the personal problems she was experiencing.

From May 1977, until October 1978, plaintiff was included in the formal Executive Committee Meetings although she was generally omitted from informal meetings between male administrators. Requests by plaintiff to Dr. Willett to help her secure the cooperation of the other administrators were ignored and went unanswered. Plaintiff testified that Dr. Willett was frequently rude to her in the presence of others, and belittled her with such names as "honey" or "sweetie." Dr. Willett testified that he called both men and women nicknames, but both Annette Burns and Stella Lane, secretary to the plaintiff, testified that Dr. Willett would change the inflection of his voice in using these terms to belittle or insult plaintiff when he addressed her. Ms. Lane said that he applied these terms to plaintiff in an insulting tone. Ms. Burns indicated that she experienced the same treatment from Dr. Willett which could be compared with the use of these nicknames to Mr. Joyner, who stated that he felt Dr. Willett used them in an affectionate manner when addressed to him.

Dr. Willett stated that he did not like to communicate with plaintiff either in person or in writing. He confirmed that plaintiff frequently sought his direction and advice, but that he just did not respond to these requests. It appeared from Dr. Willett's testimony that he initially did not respond to any of plaintiff's requests and through the passage of a year began to resent her inquiries and efforts to solve problems. He wanted the plaintiff to handle all problems on her own. Mr. Joyner confirmed that Dr. Willett seldom responded to any one's request for assistance and therefore, he, Mr. Joyner, took few if any requests to Dr. Willett. Dr. Joyner also confirmed that his duties and tasks for the eight programs were already established and set up when he came to the Institute. Dr. Stinson however had areas of responsibility that were new, vaguely defined and had to be coordinated with the other divisions. Plaintiff was not invited by Dr. Willett to lunch with him, although the two male administrators often were. The plaintiff stated that she felt excluded by the men, particularly in informal matters and as such, she felt suffi-

ciently rebuffed not to try and join them. The physical location of her office prevented her from seeing them when they left for lunch. Robbie Pentecost, Marsha Knaggs, Norma Hite and Stella Lane all testified that the male administrators generally ate together and seldom, if ever, ate with their staff; whereas, plaintiff was frequently seen having lunch with her staff and ate with each of them on various occasions.

Other male administrators would circumvent plaintiff by failing to give her notice of meetings, make requests directly of her employees without regard to the assignments she had already made, and similarly ignored her requests for assistance. Dr. Stinson testified about a memo she wrote Mr. Vaughn on 7/18/77 in which she asked to be notified when patients and wards were relocated at the Institute so that her staff could locate these patients. Mr. Vaughn never responded to the memo.

The plaintiff was excluded from budget meetings with the other administrators. In a lengthy explanation, Mr. Joyner stated how funds were more or less already allocated and that the budget committee had only several thousand dollars to distribute itself. According to Mr. Joyner, recommendations about allocations could be made, but were not always observed. Under her official job title as Assistant Superintendent of Professional Services, plaintiff's job description stated that she "participates in preparation of budget for professional services". (Defendant's Exhibit 8) Neither Dr. Willett nor Mr. Joyner as Superintendents allowed her to participate in budget preparation, despite her job description. In direct contrast, Mr. Joyner's official job description contained nothing to indicate he should be involved in budget preparation. (Defendant's Exhibit 5)

In plaintiff's position as Assistant Superintendent of Professional Services, Dr. Stinson was essentially placed in the position of monitoring the divisions of the other Superintendents and acting as a watchdog of their programs to ensure proper care for the patients. Dr. Stinson was charged with the responsibility of quality assurance, the Learning Resource Center and of infection control. Reports of deficiencies had to be made and corrected. As plaintiff recognized and pointed out, if improvements were not made, patient care would suffer and the Institute would probably fail the accreditation review. This "watchdog" aspect of her job placed plaintiff in an adversary relationship with the Assistant Superintendents but the reason they articulated to justify the different treatment she received was personal disagreement with her management style.

To substantiate his claim that plaintiff was a poor administrator, Dr. Willett testified that he could remember one or two times in Executive Committee meetings where plaintiff would make a remark critical of Mr. Joyner or Mr. Vaughn, a remark he did not think quite fair. He could not remember any specific comments, but relied solely on general statements. However, when Mr. Vaughn would bring complaints to Dr. Willett about plaintiff that other employees supposedly made, regardless of the nature of the complaint or its truthfulness, Dr. Willett never felt it was unprofessional or unfair to the plaintiff, nor did he ever mention it to Dr. Stinson. Dr. Willett characterized Dr. Stinson's attitude on occasion in harsh terms, describing her as hostile when no one responded to her requests. Plaintiff testified that as her requests continued to be ignored, she became more and more frustrated as to how she could solve problems and answer her staff's questions. Stella Lane testified that she typed many memos for the plaintiff to Dr. Willett, Mr. Joyner and Mr. Vaughn with requests for help and cooperation, but that plaintiff seldom received a response. Ms. Lane said that the plaintiff was not accepted by the other administrators and that her efforts were not appreciated. (At the time of trial, Ms. Lane was Harold Hughes' secretary).

In January 1978, Dr. Stinson was participating in a Minority Evaluation Committee set up at the Institute. The purpose of the Committee was to evaluate the progress the Institute was making in its practices regarding minorities and to coordinate its re-

sults with the Minority Studies of Blacks being conducted under a federal grant at the downtown Central Office. The Minority Evaluation Committee was chaired by a man, Dr. James Maslowski. In April 1978, Dr. Maslowski presented plaintiff with some of the Committee's findings, a portion of which included salary differences between male and female professionals at the Institute. Plaintiff called to the attention of Dr. Willett the inequities in pay and job duties. On April 11, 1978, plaintiff sent Dr. Willett a two-page memo, pointing out these inequities and indicating

> "the issue of pay ranges for specific duties heavily involves our job classification system. Theoretically, the personnel network in the new Civil Service Systems are to alleviate some of these inequities when fully implemented. The fact remains, however, that the staffing patterns established therein are based on crude 'guesstimates' of staffing needs for hypothetically determined grouping of job tasks.
>
> Until we, here at the Institute, generate our own internal system of classification evaluation and adjust such positions and pay ranges to fit the job needs of the Institute, obvious inequities will continue to exist. Although the issues purported by all minority interest groups revolve around equal opportunity, the general issue of 'equal pay for equal work' transends all minority concepts. The solution of such an issue in general, would concurrently serve to alleviate even the vast bulk of minority questions concerning employment practices." (Plaintiff's Exhibit 4, 4/11/78) (Plaintiff's Exhibit 47)

In the memo, plaintiff used herself as an example of the pay inequities but clearly stated, "I am not complaining about my salary, but I am concerned about glaring examples of inequity in job vs. pay for women, as well as blacks and other minorities." Plaintiff suggested a possible way to solve the problem.

> "The keys to solution of these inequities lie in two basic approaches. The first includes finite definition of functional job roles and responsibilities. The second in-

cludes, as following the on site evaluation of job tasks as a basis for job classification and pay scale assessment. With these approaches well established, the Institute can then (1) objectively look at its own problem areas, (2) establish a positive attitude toward division of work assignments, and (3) document legitimate reclassification action as per ever-changing Institute needs." (Plaintiff's Exhibit 4, 4/11/78)

She closed by stating that she would,

> "be very happy to work with anyone to gather accurate and proper data for verification on this issue, as well as others involving management objectives and patient care. I know that such an issue may be difficult to deal with, but it would seemingly behoove all of us to resolve it, for we represent that which the taxpayers support in this institution." (Plaintiff's Exhibit 9, 4/11/78)

Dr. Willett responded a week later in a memo dated 4/18/78 as follows:

> "In response to your inquiry concerning equity of pay scale and job classification, there is a task force now in operation studying these problems. In a short time, we should be able to address the problems you raised and give you a more comprehensive answer. I trust this will be satisfactory." (Plaintiff's Exhibit 51, Answer 2, 3, 4, 5.)

Two months later, Dr. Willett wrote plaintiff that "a month or two ago, you requested consideration for adjustment of your salary to make it equal with the other Assistant Superintendents." (Plaintiff's Exhibit 9, 6/28/78) He told her there were no provisions for her position in the State Compensation Plan and that the task force on staffing indicated that such a position would probably not be added. Dr. Willett reduced her duties and her staff, allowing her to retain her title as a courtesy only. Dr. Willett testified that he took no action to have plaintiff's position properly classified, nor did he take any action to see if plaintiff could be assigned one of the proper classifications which existed at the time,

such as "Assistant Superintendent for Training and Research" or "Assistant Superintendent for Community Services." Norma Hite, Personnel Management Analyst II, at MTMHI, testified that both of these job titles could have been assigned to the plaintiff and would have been consistent with the duties she was performing.

It was clear that the plaintiff made no request for a salary change. Dr. Willett, however, seized upon her April memo to justify demoting her. Not only did he demote plaintiff, but Dr. Willett sent her two additional memos on that same day. One harshly criticized her work performance.

"You have written more disciplinary notices concerning professional employees than any other supervisor in my experience."

Dr. Willett could recall only one notice (about Harold Hughes) which plaintiff had written.

"I am not saying that some of them were not justified, but I do think that preventive measures could have kept most of them from requiring disciplinary action."

The disciplinary notice was a verbal warning from plaintiff to Mr. Hughes because he had refused for over nine months to write up a plan of corrective action for the quality assurance program, refused to work with other program directors or to notify plaintiff of staff meetings. (Plaintiff's Exhibit 9, 4/21/78) Mr. Hughes was a close friend of John Vaughn and plaintiff testified that Mr. Vaughn would intercede on Mr. Hughes' behalf at Executive Committee Meetings.

Dr. Willett also noted employee complaints about the plaintiff.

"I would estimate that at least half of the people whom you supervise have complained of your supervision."

At trial, Dr. Willett could only name two people (of the 115 employees plaintiff supervised) who had come to him with complaints about her. He named other employees but the source of his information were

the two individuals who testified against the plaintiff at the trial. These two employees were Mr. Harold Hughes and Ms. Irene Herder. Mr. Hughes, Director of Adjunctive Therapy, was supervised by the plaintiff. At the trial, he had two complaints regarding his own situation. One, that on one occasion plaintiff appeared upset that he had gone directly to Dr. Willett to discuss plans about his Department without consulting her. His second complaint was a disciplinary notice he had received from plaintiff in April 1978. Mr. Hughes testified that until the reprimand he felt that he and the plaintiff "did not have, I thought, a very bad relationship." Plaintiff explained that she was critical of Mr. Hughes on the first occasion because he had tried to cover up for one of his employees who had accepted a large donation of shoes and was distributing them throughout the Institution. Plaintiff had brought the matter to Dr. Willett's attention and Mr. Hughes had tried to interfere in the investigation. Dr. Stinson further indicated that the reprimand in April 1978, was only issued after repeated attempts to secure Mr. Hughes' cooperation. Mr. Hughes' greatest personal complaint about plaintiff arose only a few days before trial when he reviewed his personnel file. He read the memo plaintiff had written to Dr. Willett in his personnel file with the specific complaints which he felt to be damaging, "I've only become aware of this in recent days."

Irene Herder, Director of the Learning Resource Center (LRC), had a number of complaints about plaintiff. She testified that plaintiff was angry with her because Leon Joyner and Larry Thompson had stopped and talked to her late one afternoon. Through the testimony of Mr. Joyner and Dr. Stinson, it was clarified that Mr. Joyner and Mr. Thompson had stopped Ms. Herder to tell her that they did not want John Perry to be involved in any of the LRC's instructional activities in the Children and Youth Program.[1]

---

1. Mr. Perry originally worked under Mr. Joyner in the Children and Youth Program. He was

fired when two workers under his supervision were alleged to have mistreated two children

Mr. Joyner admitted that both he and Mr. Thompson were very upset and concerned about the situation and may have appeared angry when talking with Ms. Herder. Plaintiff explained that Irene Herder had come to her distressed because of the manner in which Mr. Joyner and Mr. Thompson had talked to her. Both men had made it very clear to Ms. Herder that they did not want Mr. Perry in the Children and Youth Program and they had been emphatic in stressing their objections to his presence. Plaintiff was not angry with Ms. Herder but exactly the opposite, she calmed down an angry Ms. Herder.

Further, plaintiff was assigned the ultimate responsibility for the unwanted employee. As John Perry testified, he knew that when he was reinstated, he was regarded by most of the employees as undesirable. Plaintiff accepted him, whereas Ms. Herder seemed to resent his presence. He said that plaintiff helped him adjust and was supportive of him in a difficult time despite the resentment of Ms. Herder and Mr. Joyner. Mr. Perry felt that plaintiff worked well with people from what he was able to observe at the Institute and at staff meetings and her treatment of other employees. He knew of no complaints that other employees had about Dr. Stinson even though he came into contact with many of them at the LRC.

Ms. Herder said that plaintiff required her to act as a witness in a conversation with Dr. Willett about Darlene Earp, a social worker at MTMHI.[2] Marsha Knaggs contradicted Ms. Herder's testimony by stating (1) that the incident occurred at the close of a staff meeting (not in a conversation between Miss Earp and Ms. Herder as was stated by Ms. Herder); (2) that she, Marsha Knaggs, was the person who was present when plaintiff received the memo from Dr. Willett which instructed plaintiff to apologize to Miss Earp; and (3) that it was she who witnessed Dr. Stinson's apology to Miss Earp. Plaintiff testified that she never went to Dr. Willett's office after receiving the memo, but instead, asked Miss Knaggs to accompany her to Miss Earp's office. Plaintiff explained that Miss Knaggs was the appropriate individual to assist her because she was the professional consultant for social workers.

Irene Herder said that plaintiff frequently threatened her job if she refused to do certain acts, but never considered asking for a transfer. Ms. Herder claimed that plaintiff had gone shouting throughout the Third Floor when she was assigned an office. Neither Marsha Knaggs nor Norma Hite, who had offices on that floor at the time, could recall such an incident. Ms. Herder complained that plaintiff had her write reprimands against Norma Hite and Harold Hughes. Plaintiff wrote the reprimand against Mr. Hughes and stated that Ms. Herder had nothing to do with it. Norma Hite testified that Ms. Herder resented her friendship with plaintiff and constantly sought to create friction between the two women. Ms. Hite testified that whenever matters were related to Ms. Herder, they became extremely distorted and she would have to talk with plaintiff to straighten them out. Ms. Hite felt she had a very good working relationship with the plaintiff, thought she was extremely capable and that under the working conditions as they existed at the Institute, that plaintiff did a very good job. Ms. Hite had heard no complaints about Dr. Stinson from other employees.

on a camping trip. Mr. Perry appealed the termination and was ordered reinstated; however, he was not returned to his old position under Mr. Joyner, but instead assigned by Mr. Joyner to Professional Services.

**2.** Dr. Willett wrote Dr. Stinson a memo about a comment made at the close of a staff meeting. Dr. Willett was not present at the meeting and although he wrote that normally he would check out the complaint, in this instance he felt Dr. Stinson should immediately apologize to Miss Earp. Miss Knaggs testified that when Dr. Stinson went to Miss Earp, it became apparent that there had been a misunderstanding, that Dr. Stinson had raised her voice to be heard over the employees leaving the meeting and that Miss Earp appeared satisfied with the outcome.

Ms. Herder stated that she took various complaints directly to Dr. Willett about the plaintiff, but that no real results occurred, "Well, I really didn't see anything, you know." But when questioned about what changes she was seeking, if not a transfer, Ms. Herder responded, "I think what I was saying and doing was for the benefit of the hospital and I was just more or less questioning some of the goals and objectives and where they were coming from."

Ms. Herder's testimony is replete with contradictions. She said that plaintiff assigned John Perry to work with her. But both John Perry and Mr. Joyner stated that Mr. Joyner had made the assignment when Mr. Perry was reinstated. Ms. Herder said that plaintiff was upset when she read the Earp memo. But Ms. Herder said that she too would have been upset if she had received a similar memo in the fashion in which Dr. Willett presented it to the plaintiff. She blamed plaintiff for the untrained technicians, "It was an ongoing problem because Dr. Stinson would not stay out of it." Yet she later confirmed that, "It was a problem before Dr. Stinson came and has been a problem right up until the present."

Ms. Herder confirmed that if Dr. Check failed to turn in reports of his activities, she in turn notified the plaintiff. Dr. Stinson testified that it was Ms. Herder who repeatedly complained about Dr. Check and that she, in turn, was carrying these complaints to the administration. Since Dr. Check was supervised directly by Ms. Herder, it would be unlikely that Dr. Stinson would initiate the complaints about Dr. Check yet Dr. Stinson is faulted for bringing the complaints to Dr. Willett and seeking to resolve Ms. Herder's complaints.

These are the only two employees supervised by plaintiff who were called to testify that half the employees she supervised complained about her. It was obvious that these two employees disliked Dr. Stinson. Dr. Stinson was able to present both on direct and in rebuttal testimony (from former and current employees whom she had supervised) that she was well-liked, that she was highly regarded as a supervisor and as an administrator.

In the third memo, dated June 29, 1978, Dr. Willett relieved plaintiff of many of the areas originally assigned to her and set out a new reorganization chart. This demotion action occurred shortly after the receipt by Dr. Willett of the preliminary report of the accreditation team that the Institute had been approved for accreditation. Although Dr. Willett learned in early May 1978, that the title of Assistant Superintendent for Professional Services was not a proper pay classification title, he took no action to inform the plaintiff of that while she was heavily involved in completing the reports and details necessary to acquire accreditation.[3] Neither did Dr. Willett take any action to secure a proper pay classification title for Dr. Stinson. (Plaintiff's Exhibit 9, 6/29/78)

Dr. Stinson was greatly upset by the abrupt manner in which the reduction in her duties, responsibilities and position took place. She had no authority in her reduced capacity. She wrote to Dr. Willett to start the internal employee grievance procedure, but was advised in writing by John Vaughn (not Dr. Willett who had gone out of town) that such action would be useless and advised her to file a charge of discrimination with the Tennessee Commission on Human Development. In July 1978, plaintiff wrote to the Department of Labor, Office of Equal Opportunity, alleging that she was required to carry the same responsibilities as her male peers but denied equal pay. When she pursued the issue, she was chastised, given cruel and harsh treatment, relieved of her responsibilities and placed on an assignment that resulted in total isolation of her office with nothing to do. In September 1978, she filed an official Charge of Employment Discrimination based on sex. Within a month, she was notified by

3. Dr. Willett testified that after he received the letter concerning pay inequities, he asked John Vaughn (not the Director of Personnel) to check on Dr. Stinson's status. Mr. Vaughn shortly thereafter reported to Dr. Willett that her position was not an approved pay classification position, but Dr. Willett took no action until late June 1978.

Dr. Willett that her position as Assistant Superintendent for Professional Services would be abolished.[4]

Upon notice that her position would be abolished, plaintiff filed a Charge of Retaliation on October 27, 1978. (Plaintiff's Exhibit 31). In March 1979, her position was abolished, and she was transferred to a new job with the title of "Program Evaluator". Dr. Stinson was again assigned a position that was not an official pay classification. (From the date of her initial hire in May, 1977, through the present, Dr. Stinson's official pay classification has been and remains, "Director of Professional Services.")

In the position as Program Evaluator, plaintiff had no promotional potential under the new reorganization. Any advancement she hoped to make would have required a transfer from such position. Her duties were directly dependent upon the Superintendent to request that a program be evaluated. From March 1979, until November 1979, Dr. Willett made few, if any, requests of plaintiff to perform any work. The few requests that he did make did not regard program evaluation, but rather were studies which duplicated other work, some clerical assignments and occasional small tasks. Stella Lane testified that after the demotion, plaintiff had few secretarial assignments for her. After the March 1979, action Stella Lane said that Dr. Stinson had advised her to seek another position because she had nothing for Ms. Lane to type or prepare. Dr. Stinson also advised Ms. Lane that if she remained with her, she too may become a victim of retaliation. Both Ms. Lane and Bonnie Bigham, a nurse with offices adjacent to Dr. Stinson, testified that for weeks at a time, Dr. Stinson had no job assignments.

On March 2, 1979, plaintiff applied to Dr. Willett for the position of Assistant Super-intendent of Residential Services which Mr. Joyner was vacating. Plaintiff was denied the position and a white male, Richard Wales, was selected. The rejection of plaintiff was in contradiction to the status report written by Dr. Willett to Thomas O.H. Smith, Chairman of the Board of Directors of MTMHI, on April 11, 1979. (Plaintiff's Exhibit 19). In that status report, Dr. Willett clearly stated that they were seeking a minority to fill that position.

By mid-April, plaintiff was the subject of rumors at the Institute. She sought Dr. Willett's help in resolving this matter but on each occasion he offered no solutions or recommendations. In one instance, she asked her secretary to accompany her to Dr. Willett's office to discuss the seriousness of the rumors and their effect on her reputation. Dr. Willett replied in a stern memo dated April 25, 1979, that "the good administrative practice is to ignore them unless they are substantial enough to be investigated." Dr. Stinson felt that the rumors were substantial and testimony at trial confirmed that many of the allegations she brought to Dr. Willett were in fact circulating at the Institute.

Shortly after that memo, Dr. Willett wrote another memo. He chastised her for not having the goals and objectives for the eight program directors prepared properly for him but ignored the two or three memos he had received earlier from her asking for his help in getting the cooperation of those eight program directors to supply her with the information necessary to write those goals and objectives. Further, Dr. Willett instructed her "I never want you to bring an uninvited person to this office again". He then criticized her for bringing her secretary to his office and summed up "I believe you should apologize for the entire incident, but of course that is up to you."

---

4. From the testimony, it appears that Dr. Willett relied heavily upon Mr. Joyner for his expertise in personnel matters and delegated many responsibilities to him. In April, 1978, Mr. Joyner had been appointed by Dr. Peipers to work on a task force on staffing patterns at the State's Mental Health Institutions. The task force reviewed all of the staff positions at these institutes, including Dr. Stinson's. This task force recommended that Dr. Stinson's position be eliminated. Given Mr. Joyner's close ties to Dr. Peipers and his delegated authority from Dr. Willett, if he had recommended that the task force preserve Dr. Stinson's position, his recommendation would probably have been adopted. Further, Mr. Joyner was aware of the two valid Assistant Superintendent positions which could have been assigned to Dr. Stinson.

On May 2, 1979, plaintiff applied for authorization to attend a training workshop and two days later Dr. Willett responded in a curt fashion, "I certainly am sorry we don't have the money for this worthwhile project." These were just a few of the retaliatory acts taken against Dr. Stinson.

On May 7, 1979, Dr. Stinson filed a second Charge of Retaliation alleging that efforts were being made to terminate, covertly or overtly, her employment because she had taken steps to secure her rights to be free from sex discrimination in employment. The filing of this charge, however, did not terminate the harassment and retaliation to which she was subjected. (Plaintiff's Exhibit 31).

On June 8, 1979, Dr. Willett sent a terse memo to Dr. Stinson. "It is my understanding that you took a young man to an Assistant Commissioner's Office yesterday, referring him for mental health services. What were the circumstances?" is all the memo said. Dr. Stinson's memo in response stated that a stranger asked her if she knew where the offices for Mental Health on Union Street were. She directed the young man to Mr. Joyner who was coming out the door and Mr. Joyner pointed out the office which he was seeking. Plaintiff did not know the young man nor did she know how Dr. Willett learned of this matter since it occurred in downtown Nashville and he was at the Institute several miles away. However, plaintiff testified that from March 1979, until November 1979, Dr. Willett's treatment of her was harsh and unwarranted. On August 22, 1979, he told her that she would not receive a merit increase:

"I have felt it necessary to write you on two or three occasions in a negative way concerning your work; the others, I have not. It is extremely difficult, of course, to equate one professional against another. However, it was on this basis that I have granted a merit increase to the others and have not to you."

On September 4, 1979, plaintiff's request to attend a New Orleans seminar was immediately returned the same day by Dr. Willett, denying the request and stating "If you wish to go and pay your own way, maybe we could get the rules relaxed enough to allow you administrative leave." (Plaintiff's Exhibit 9, 9/4/79) (Plaintiff's Exhibit 47).

The surveillance, lack of assignments and repeated denials of assistance were not explained at any time by Dr. Willett and the Court finds that such actions constitute retaliation against plaintiff for attempting to secure her rights to be free from sex discrimination in employment.

When Dr. Willett resigned in October 1979, Leon Joyner returned to the Institute, first as Acting Superintendent and then later as the Superintendent. On October 2, 1979, Leon Joyner advised the plaintiff to report to Dr. Wales since he would be working on an irregular schedule and in all likelihood would not be available to her as much as might be desired. Neither Mr. Joyner nor Dr. Wales made any requests of plaintiff to evaluate any of the programs during 1979 or 1980.

Throughout October and November 1979, plaintiff worked under Dr. Wales although she pointed out to him in a memo dated November 5, 1979:

"My office has little to none, in the way of internal involvement with activities at MTMHI. I am not serving on any committees, not invited to attend any management meetings or professional meetings. It is rare during my working hours that I have the opportunity to interact with others, unless I talk with the secretary and nurse in these offices, or someone occasionally comes by to see if I am still employed at the Institute. I have to dig for constructive activities, although I have consecutively registered these concerns over the past nine months."

"There have been no instructions or guidance from administrators, and was told on numerous occasions that these projects were not necessary. Even though the goals and objectives for most of the programs were not adequate when trying of measure output, and that as the program evaluator I stood a good chance of ultimately being blamed for these deficiencies."

"You stated that you hoped Program Evaluation would not receive full approval when surveyed by JCAH. That noncompliance, or partial would give leverage to get the needs of program evaluation met. That is fine, if that in fact is the objective of administration. But again, that places me in the difficult position of being in this program and that I was not able to get it in shape to meet JCAH standards."

Plaintiff was placed in the situation of heading up a program in name only, given no authority or means by which to make the program work, and yet being in the posture of criticism for failure to do the job. Plaintiff was concerned that JCAH understand the full problems with Program Evaluation. The Joint Committee on Accreditation of Hospitals (JCAH) was due for a site visit December 3–7, 1979. On December 4, 1979, plaintiff called John Vaughn to find out when the survey team would want to meet with her. Earlier she had called Dr. Wales' office and made the same inquiry. Both times she was told she would be notified. On December 5, 1979, she contacted Mr. Joyner about the JCAH visit. She pointed out that not only had policies and procedures for program evaluation been changed without input from her, the changes placed her directly under Mac Schrimsher, a subordinate, rather than under the Superintendent. Mr. Joyner indicated that he would take immediate steps to correct the mistake. Nonetheless, Mr. Joyner took no action and the JCAH team left without discussing any matters with the plaintiff. As plaintiff explained, it was necessary for the JCAH team to ask to see her and unless the administration informed them as to her job title and responsibilities, they would have no way of knowing that she was available. Despite her many requests to various administrators that she be scheduled for an appointment with the JCAH team, she was never contacted. As a result, plaintiff wrote to the new Commissioner, James Brown, telling him of the problems that she was having at the Institute. Immediately upon receiving a copy of the letter, Mr. Joyner issued a three-day suspension to the plaintiff for writing the letter. Although on December 20, 1979, he authorized the plaintiff to pursue the administrative grievance procedure, he consulted several other male administrators (and without consulting Dr. Stinson) Mr. Joyner reduced the disciplinary notice to verbal warning, thus eliminating any possibility of an appeal by Dr. Stinson.

Accordingly, the Court finds as follows:

The defendant, MTMHI, is an employer within the definition of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b) and this Court has subject matter jurisdiction of this cause. The plaintiff, Velda Joyce Stinson, was a qualified health professional and employed by the defendant in May 1977, as Assistant Superintendent for Professional Services. Although she did not apply for that position, it was offered to her by Dr. James Willett after she had been rejected for the initial position for which she had applied, that is, Assistant Superintendent of Administrative Services for which a male was selected. Dr. Stinson is a member of the protected category defined by Title VII.

Plaintiff fully performed her duties as Assistant Superintendent for Professional Services, and in fact, set up both new programs, obtained grants, supervised over 100 people during the time when MTMHI was reorganizing under a programmatic concept and attempting to also become an accredited hospital. Dr. Stinson worked diligently and tirelessly in her efforts to help secure the accreditation.

In April 1977, under the new reorganization of the Institute, plaintiff had been appointed the new administrator. Four Assistant Superintendent positions were set up, all of them which were filled by men, except for plaintiff's position. Plaintiff worked very closely with her employees, but was isolated and ignored by the other male administrators, particularly Dr. Willett. From May 1977 until June 1978, plaintiff repeatedly requested, both in person and in writing, assistance and advice from Dr. Willett. These requests were generally ignored by Dr. Willett.

In response to Dr. Stinson's memo of April 1978, which summarized employment inequities between men and women professionals, Dr. Willett notified plaintiff at the end of June that her position as Assistant Superintendent for Professional Services did not exist, that her responsibilities would be dramatically curtailed, that her staff would be significantly reduced, and that he had received numerous complaints about her from employees at the Institute. She could retain her title as a courtesy only and her Department was completely reorganized. Dr. Willett took this action only after receiving notice that the Institute had received preliminary approval for accreditation in mid-June, 1978.

Plaintiff sought to appeal the action through the MTMHI employee grievance procedure. She was advised that such action would be useless and to file a charge of sex discrimination with the Tennessee Commission on Human Development. In September 1978 plaintiff filed a Charge of Employment Discrimination based on sex. Approximately one month later, plaintiff was notified by Dr. Willett that her position would be abolished. Plaintiff then filed a Charge of Retaliation and subsequently her position was abolished in March, 1979. From September 1978, through the present, plaintiff had few, if any duties to perform, her parking space was reassigned, she was removed from the administrative suite, isolated from other employees and subject to harassment.

In March 1979, when her position was abolished, plaintiff was assigned an unofficial title of "Program Evaluator." In that position, plaintiff was required to perform evaluations of programs at the Institute only upon request by Dr. Willett. From March 1979, through October 1979, Dr. Willett made no requests for program evaluations, although on a few occasions, Dr. Willett asked her to perform some small studies, clerical duties or routine research. Upon Dr. Willett's resignation, Mr. Joyner

became Acting Superintendent. From the time of his appointment through 1980, Mr. Joyner likewise failed to request that plaintiff conduct any program evaluations.

In May 1979, plaintiff filed a second Charge of Retaliation. Dr. Stinson was subjected to harassment, overt retaliation and isolated from the other employees at the Institute. In December 1979, Mr. Joyner issued a three-day suspension to plaintiff for writing a letter to the new Commissioner. When plaintiff appealed the suspension, Mr. Joyner originally authorized the appeal, but subsequently revised the disciplinary notice to a verbal warning, thus preventing plaintiff from a hearing of her appeal.

In comparison with the other Assistant Superintendents, plaintiff has not received comparable pay or treatment to that of the male Assistant Superintendents. Plaintiff was assigned a pay classification which did not exist unlike the valid pay classification titles given to the male administrators, no effort was made to secure a valid pay classification title for her, and in response to her memo of pay inequities at the Institute, she was demoted, her job responsibilities greatly reduced and many of the privileges associated with the position of Assistant Superintendent were eventually withdrawn from her. The Court finds that the defendant treated the plaintiff unfavorably for over one year while she was Assistant Superintendent and further unfairly demoted her because of her inquiry into pay inequities based on sex. None of the male administrators received any comparable treatment which so adversely affected them. From the filing of the Charge of Employment Discrimination until the trial in September 1980, the plaintiff was treated by the defendants as if she had been constructively demoted to a clerical position. The Court finds that termination of her position, the subsequent surveillance, rejections, and failures to promote [5] constitute retaliation and

5. As noted above, in March 1979, Dr. Stinson wrote Dr. Willett and asked to be considered for the position of Assistant Superintendent for Residential Services. In addition, she applied

for the position of Deputy Assistant Commissioner on February 14, 1979, and on February 28, 1979, she applied for the position of Director of Drug and Alcohol Program at the

reprisal against the plaintiff for filing a charge of employment discrimination. The Court finds that similarly situated male employees never received nor were they subjected to constructive demotions, reduction in duties or failure to promote which the plaintiff experienced. The Court further finds that similarly situated male employees advanced faster than the plaintiff and that their earnings increased at an accelerated rate in comparison to that of Dr. Stinson's.[6]

The Court finds that the defendant failed to support its explanation that the plaintiff was a poor manager or that her lack of a proper pay classification was sufficient reason to drastically reduce her job duties and staff. The Court notes that for over one year, the defendant failed and refused to respond to the legitimate work problems and concerns raised by the plaintiff. The Court notes that former employees at the hospital, Bonnie Bigham, Ivan Bailey, Annette Burns and John Perry, observed plaintiff to be a good manager, dedicated to her job and the Institute. Further, current employees such as Stella Lane, Norma Hite, Marsha Knaggs and Robbie Pentecost felt that she was a good supervisor and administrator, worked well with people, conducted regular staff meetings, spelled out expectations for employees, and attempted to provide her employees with enough guidance

as was appropriate. Many of the witnesses testified that the plaintiff was very helpful to them during the many changes and new duties that occurred at the Institute while she was the Assistant Superintendent.[7]

During the time that plaintiff served as Assistant Superintendent for Professional Services, the defendant treated her adversely compared with similarly situated males. The Court can find no justified reason for this treatment and must find that such adverse treatment occurred because she is a woman. Further, the Court finds that plaintiff was engaged in a protected activity when she filed her EEOC charge and opposed the discriminatory practices to which she had been subjected. Such adverse treatment and subsequent retaliation and reprisal constitutes unlawful employment practices and entitles the plaintiff to relief.

*The Applicable Legal Principles*

The plaintiff must demonstrate that the defendant has treated her less favorably than others because of her sex. *Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Furnco Construction Company v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

---

Central Office. On March 7, 1979, she applied for the position of Chief of Planning and Development and another position of Educational Director II Research, Planning and Development. On March 13, 1979, she applied for the position of Assistant Commissioner for Administration and on April 3, 1979, she applied for the position of Assistant to the Commissioner. On April 8, 1980, she applied for the position of Assistant Commissioner of Drug and Alcohol. (Plaintiff's Exhibit 47, Answer No. 1). She was rejected for promotion to all of these positions despite her educational and employment background. Further, with regards to the position of Assistant Commissioner of Alcohol and Drug Abuse, she wrote to the Commissioner pointing out that she had been fourth on the Civil Service appointments list and first on the promotional list. Throughout 1979 and 1980, Dr. Stinson continued to seek transfer and promotion.

6. In August 1977, as Assistant Superintendent, Dr. Stinson earned $1,813 per month compared

to $2,126 earned by Mr. Joyner, $1,814 earned by Dr. Wales, a program director, and $1,842 earned by Larry Thompson, another program director under Mr. Joyner. Mr. Vaughn earned $1,766 but had a car furnished to him.

In March 1979, plaintiff earned $1,967 per month. Mr. Vaughn also earned $1,967, while both Dr. Wales and Larry Thompson earned $2,061 and Mr. Joyner earned $2,602.

In March 1980, plaintiff earned $2,061 per month compared to Mr. Vaughn's $2,158 per month, Dr. Wales and Larry Thompson earned $2,262 and Mr. Joyner earned $3,108.

7. At trial, the witness who complained most about Dr. Stinson, Irene Herder, begrudgingly admitted that Dr. Stinson tried in her own way to help Ms. Herder find a new assignment when her position was abolished in June 1978, and expressed her appreciation to Dr. Stinson for taking the time to meet with the staff and inform them as to what was happening in Professional Services.

■ Although *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that the rejection was not the result from the two most common legitimate reasons on which an employer might rely to reject a job applicant (in this instance, to demote an employee or refuse to promote the employee): An absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one. *Teamsters v. United States,* 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44. An inference can be rebutted by the defendant by articulating some legitimate nondiscriminatory reason. *Board of Trustees of Keene State College v. Sweeny,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

While the stages of proof set forth in *McDonnell-Douglas* are not absolute, the plaintiff always carries the burden of proving by a preponderance of the evidence that the defendant discriminated against her. *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Board of Trustees of Keene State College v. Sweeny,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216; and *Furnco Construction Company v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957. Since direct proof of discriminatory intent is often too difficult to achieve, the trier of fact must carefully weigh all of the circumstances and surrounding facts to discover such discriminatory intent, *Arlington Heights v. Metro Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Grano v. Department of Development, et al.,* 637 F.2d 1073 (6 C.A.1980). Thus, the Courts have opted for a "comparative" evidence test which is based upon the concept of "similarly situated" employee. *See East v. Romine, Inc.,* 518 F.2d 332 (5th Cir.1975); *Abrams v. Johnson,* 534 F.2d 1226 (6th Cir. 1976).

*Plaintiff's Case.*

■ To establish a prima facie case, the plaintiff first showed that although she originally applied for and was qualified for the position of Assistant Superintendent for Administrative Services (an approved pay classification position), she was rejected by the defendant. She was offered an allegedly comparable position as Assistant Superintendent for Professional Services (not an approved pay classification position) which she accepted only to discover a year later that it was not a valid position.

Second, plaintiff showed that while she held the position as Assistant Superintendent for Professional Services during that year, she was expected to. fulfill all the duties and responsibilities of an Assistant Superintendent, but was not given comparable pay, benefits or treatment to similarly situated males. The plaintiff further showed that she was considered by many of her employees to be conscientious, hard working, supportive and persevering. Plaintiff demonstrated that she actively assisted in securing accreditation for the Institute and further, she worked diligently to upgrade the quality of patient care at the Institute. The plaintiff further showed that after an inquiry into pay inequities based on sex at the Institute, her duties were substantially reduced, her staff was taken from her, she was left without a true job function for over a year and constructively demoted by the defendants in June 1978. The reduction in her duties and criticism which she received were made without any prior notice or indication of dissatisfaction with her job performance.

These adverse acts by the defendant towards plaintiff are sufficient to show the disparate treatment which plaintiff received. Her rejection initially was not due to a lack of qualifications or the absence of a vacancy. By comparison, the plaintiff received significantly different and adverse treatment from similarly situated males and without more, it is reasonable to infer that sex was the factor for the difference in treatment. *Abrams v. Johnson,* 534 F.2d 1226; *McDonnell-Douglas Corporation v.*

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

*Defendant's Case*

■ Although the burden of persuasion never leaves the plaintiff, the defendant must meet a prima facie showing of discrimination. *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. In an instance of disparate treatment, the Court only requires that the defendant articulate some legitimate non-discriminatory reason for the adverse action. *McDonnell-Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668. However, shifting the burden of proof to the defendant does not mean that in every instance a single declaratory statement will justify unfavorable treatment. According to *Furnco Construction Company v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957, the manner in which the burden of proof is carried should not be and was not intended to be rigid, mechanized or ritualistic. *Furnco,* 438 U.S. at 577, 98 S.Ct. at 2949. All legitimate reasons for rejecting an applicant should be examined and if they can be eliminated as possible reasons for the employer's action, it is "more likely than not that the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration" such as sex. *Furnco Construction Company v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957; *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396.

The defendant attempted to meet this burden of proof by stating that plaintiff would not have been selected initially but for political patronage which was exerted on her behalf, that plaintiff was a poor administrator, that similar problems had existed with plaintiff prior to her arrival at the Institute, that numerous employees complained about the plaintiff and that it was necessary to demote plaintiff because her position was not an approved pay classification position.

*Political Appointee*

The defendant contends that in 1976 plaintiff was hired back into State Government after her unsuccessful political race only because the Governor for the State of Tennessee interceded on her behalf. The former Commissioner of Mental Health, Harold Jordan, testified that he might have received a call from the Governor himself, but was positive that he at least received a call from someone in the Governor's Office. Mr. Jordan's objection was not that Dr. Stinson be rehired, but that he "didn't think it appropriate to place her in the same position." None of the witnesses for the defendant deny that plaintiff was qualified in her own right for the position. Further, defendant admits that Dr. James Willett was prepared to hire her without reservation as the best qualified applicant for the position of Assistant Superintendent for Administrative Services, the position for which she originally applied. Only because of pressure from the Commissioner and the Assistant Commissioner did Dr. Willett change his mind and acquiesce in the decision. However, both Dr. Jordan and Mr. Peipers concurred in her appointment as Assistant Superintendent for Professional Services. It is inconsistent to argue that the only reason the plaintiff received a promotion was because of prior political favoritism, but yet admit that she was the best qualified applicant and subsequently offer her a seemingly comparable Assistant Superintendent's position.

*Poor Administration and Similar Problems*

Defendant called several witnesses to indicate that plaintiff was not a good administrator. The chief administrator, Dr. Willett, was a man in poor health who delegated his responsibilities to others. Even though he was the plaintiff's only supervisor, he could not bring himself to discuss matters with Dr. Stinson in person or to communicate with her in writing. His only reason was that he just could not talk to her. His approach to administration was to frequently abdicate his role to Mr. Joyner and to avoid Dr. Stinson and her requests for help. He never reviewed her performance during the year that she served as an Assistant Superintendent. He never gave any indication that her work was unsatis-

factory. Although Dr. Willett stated that he heard rumors about Dr. Stinson, the two disgruntled employees who complained directly to him were Irene Herder and Harold Hughes. He cited in general terms that the plaintiff seemed to voice negative comments in the Executive Committee Meetings. No one ever testified that Dr. Stinson presented a negative picture of the Institute outside of Executive Committee Meetings, although the defendant relies upon the comments which Dr. Stinson made in the Executive Committee Meetings to support this allegation. From the testimony, it was apparent that many of her comments were summaries of the reports on the programs her division was supposed to monitor. She did report that her staff was not receiving the cooperation necessary to do the work satisfactorily, but the nature of the tasks required that such information be shared at the Executive Committee Meetings. To hold such comments against her as a poor administrator is to ignore the very nature of her job; had she neglected to bring these comments and summaries to the Executive Committee Meetings, she would have indeed been a poor administrator.

Dr. Willett claimed that many employees transferred out from under Dr. Stinson, but the defendants were unable to identify any employees who left specifically because of Dr. Stinson. Even Ms. Herder, with all of her complaints about Dr. Stinson, did not feel it necessary to seek a transfer and she never requested one.

In pre-trial discovery, defendants asserted that the plaintiff was creating the same problems at the Institute that had existed at the Central Office. At trial, none of the witnesses who had worked with her at the Central Office could identify what, if any, problems had previously existed at the Central Office concerning the plaintiff.[8] The only individuals at MTMHI who worked with Dr. Stinson at the Central Office were Mr. Vaughn and Mr. Joyner. Each of them testified that he did not have any direct contact with Dr. Stinson and did not work with her at Central Office. Mr. Joyner testified that he believes she was primarily involved in doing research at Central Office, traveled around the State doing these studies and was not in the office that much. He did not know what her job performance was like at Central Office, but he was unaware of any complaints. Dr. Jordan testified that he thought she was a qualified health professional and Mr. Joyner concurred in that opinion.

■ The allegation that Dr. Stinson was a poor administrator is troubling because the defendant has no established criteria or standards with which to evaluate the content of the position. *See Saracini v. Missouri Pacific Railroad Company*, 431 F.Supp. 389 (W.D.Ark.1977). Given the subjective nature of this allegation, the lack of standards to determine a good administrator, the failure to demonstrate lack of performance on behalf of the plaintiff, her qualifications or her dedication and the inherent administrative difficulties at the Institute, the defendants failed to corroborate its allegations that the plaintiff was a poor administrator. Many witnesses were peculiarly available to the defendant but not called. One complaining party was supposed to have been Norma Hite, who testified on behalf of Dr. Stinson and rebutted the allegations made by the defendant. Therefore, the Court finds that the defendant failed to bear its burden of persuasion on this alleged reason for the demotion. *See Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 786 (7th Cir.1979).

*Employee Complaints and Inability to Get Along*

■ Defendant attempts to support the demotion of the plaintiff by alleging that

---

8. The defendant's witnesses from the Central Office were Harold Jordan, Leon Joyner, Sam Peipers and John Vaughn. Harold Jordan stated that he did not disagree with the choice of Dr. Stinson for the position of Assistant Superintendent for Professional Services and that he

certainly felt she was qualified for that position. Dr. Peipers testified that he did not particularly want Dr. Stinson assigned to him after she decided to run for elected office, but he did not identify any problem involving Dr. Stinson.

employees complained about her and that she was unable to get along with other employees. Ms. Herder testified that the plaintiff made frequent changes in direction for the LRC, that she displayed her temper at work and that employee morale went down because of Dr. Stinson. Dr. Willett stated that Ms. Herder brought some of her complaints directly to him and that Mr. Vaughn related complaints he had heard from Ms. Gunter, Mac Schrimsher and Ms. Hite about the plaintiff. All of these employees were still available to the defendant at trial, but none were called. However, when Ms. Hite was called by the plaintiff, she testified that Dr. Stinson was supportive, helpful and when they had a difference of opinion on business matters, it was handled in a professional manner.

Dr. Stinson, Marsha Knaggs, Norma Hite, Leon Joyner, and Dr. Willett all concurred that given the reorganization and programmatic concept, that many changes were made during the year that Dr. Stinson served as Assistant Superintendent for Professional Services. All of the complaints raised by the defendant appear to be based on highly subjective criteria and as such are subject to close scrutiny by the Courts. *United States v. Hazelwood School District,* 534 F.2d 805 (8th Cir.1976), *rev'd on other grounds,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.1976); *Stewart v. General Motors Corp.,* 542 F.2d 445 (7th Cir.1976); *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir.1972). As the Eighth Circuit noted in *United States v. Hazelwood School District,* 534 F.2d at 813:

> "[It] is clear that employment decisions based on subjective standards carry little weight in rebutting charges of discrimination."

This Court is, thus, unmoved by these proffered reasons for the plaintiff's discharge and finds that they are pretextual. A review of the record established that the plaintiff was never given any reprimands until the date of her demotion, verbal or in writing, concerning her alleged managerial or administrative deficiencies. To the con-

trary, Stella Lane, Norma Hite, Marsha Knaggs, Robbie Pentecost, Ivan Bailey, and John Perry were complimentary of the way the plaintiff conducted herself, administered her division, supervised them and other employees and noted the support that she gave each of them on various occasions. It was not until the plaintiff inquired as to pay inequities based on sex that the defendant seized upon the opportunity to criticize the plaintiff's job performance and to ultimately demote her.

*Elimination of Position*

■ Dr. Willett claims that it was necessary to significantly remove Dr. Stinson's duties and staff when he discovered that she held a title that was not an official pay classification position. However, Dr. Willett did not explain why he had to remove those duties since they were properly identified in her official pay classification position (Director of Professional Services). Under that title, Dr. Stinson was properly performing her duties. Further, it appeared that no effort was made to assign the plaintiff an existing official pay classification title of Assistant Superintendent for Research and Development. The justification which Dr. Willett gave for the plaintiff's demotion was that he had been asking Dr. Stinson to perform more duties than the State was willing to compensate. It is not clear, but if the elimination of the plaintiff's position is alleged to have been required because of business necessity, the Sixth Circuit has declared the test for this defense to be as follows:

> "only [to justify] ... discriminatory employment practice[s] when no acceptable alternative policies or practices would better accomplish the business purpose advanced with less discriminatory impact." *EEOC v. New York Times Broadcasting Service, Inc., d/b/a WFEC–TV,* 542 F.2d 356, 361 (6th Cir.1976), citing *Head v. Timken Roller Bearing Company,* 486 F.2d 870 (6th Cir.1973).

In this case, the Court has found that the elimination of the plaintiff's position was a mere pretext to justify the demotion of the defendant. The defendant's reason that

they were asking the plaintiff to perform more work than the State was willing to pay, when the State in fact had defined her job duties to be exactly those which she was performing, defies reason and therefore cannot justify the discriminatory demotion. This Court concludes that the defendant has failed to establish a business necessity to replace the plaintiff by a preponderance of the evidence. *See also* Note, "Business Necessity Under Title VII of the Civil Rights Act of 1974; A No-Alternative Approach," 89 Yale L.J. 98 (1976).

### Plaintiff's Rebuttal-Pretext

■ A review of the record leads this Court to conclude that all of the proffered reasons forwarded by defendant to justify the plaintiff's demotion were mere pretext. As discussed herein, plaintiff demonstrated that the treatment she received in comparison with similarly situated males was significantly different and ultimately adverse to her; that allegations of political ties were inconsequential because of her own qualifications and experience; that complaints of employees were contradicted by a number of impartial witnesses on her behalf; and that the evidence of her abilities as an administrator were subjectively made and under the circumstances, could not be considered valid in light of all the testimony. Her demotion was accomplished without any attempt to find a less adverse impact on the plaintiff and was used to punish the plaintiff for a reasonable inquiry which she had made. The defendant offered Marjorie Caldwell, Superintendent at Green Valley, to testify that women were afforded every advantage in employment. This attempt does not render moot the discriminatory fashion in which the plaintiff was treated or make judicial sanctions improper. *United States v. IBEW, Local 38,* 428 F.2d 144 (6th Cir.1970). The Court finds that the plaintiff sufficiently rebutted each and every reason alleged by the defendants to legitimately support their action and that such reasons are pretextual. The plaintiff has demonstrated by a preponderance of the evidence that the defendants unlawfully discriminated against her because of her sex.

### Plaintiff's Retaliation Claim

■ Plaintiff presented ample evidence that after filing a complaint with the EEOC in September 1978, that she was blatantly ignored by her supervisor, that legitimate requests were routinely ignored or denied, that even upon filing a Charge of Retaliation, the defendant proceeded upon its course to eliminate her job, threaten suspensions when she sought additional relief, denied merit raises and failed to promote her. The defendant never demonstrated that the plaintiff's opposition became excessively disloyal or hostile or disruptive or damaging to the Institute, *Hochstadt v. Worcester Foundation for Experimental Biology, Inc.,* 545 F.2d 222 (1st Cir.1976). Second, the plaintiff need only have a reasonable belief that the defendant was engaged in an unlawful employment practice on which she based her opposition. *See Sias v. City Demonstration Agency,* 588 F.2d 692 (9th Cir.1978); *EEOC v. Johnson Company,* 18 FEP 896 (D.Minn.1978).

The plaintiff has demonstrated many acts which occurred after her filing of the EEOC complaint which did not justify the stringent measures taken against her. Therefore, the Court concludes that the plaintiff is entitled to relief as concerns her allegations of retaliation.

### Relief Afforded to the Plaintiff

■ In *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1976), the Supreme Court concluded that Title VII was designed to "make whole" the victims of discrimination. Therefore, backpay is an integral part of making the plaintiff whole. *City of Los Angeles v. Manhart,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). The Court finds that the plaintiff suffered lost wages in the amount of $9,756.00.[9] The Court

---

**9.** The lost wages were computed by comparing Dr. Stinson's income on a monthly basis with that of Mr. Joyner and two male supervisors, Dr. Wales and Mr. Thompson. Three different years were selected, salaries were taken for each of the individuals at that time and the

concludes that the plaintiff should also be entitled to prejudgment interest at the legal rate. *Tidwell v. American Oil Company,* 332 F.Supp. 424 (D.Utah 1971).

■ In deciding whether to reinstate the plaintiff to her former position, it appears that the plaintiff has continued to hold the same official title of Director of Professional Services. From the testimony at trial, the Court concludes that the plaintiff has worked diligently to maintain a good working relationship and according to Mr. Joyner, in the last year, Dr. Stinson seems to have made an adjustment as to the roles and responsibilities within Program Evaluation. Given the effort of the plaintiff to maintain a positive attitude towards the employer, and that an official pay classification title exists at the present time to which she could be assigned, it is ORDERED that plaintiff be reinstated to her former position of Assistant Superintendent, provided, however, that she be assigned an official title to adequately reflect her job duties. Further, given the denial of merit increases which the plaintiff sustained because of the defendant's acts of retaliation and reprisal, the Court finds that the plaintiff is entitled to an additional award equal to that amount which she should have received at the time of her first denial of a merit increase by Dr. Willett. No evidence was presented to determine this award and additional proof shall be submitted to justify the award. *Franks v. Bowman Transportation Company,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1978); *EEOC v. Kallir, Philips, Roth, Inc.,* 420 F.Supp. 919 (S.D.N.Y.1976), *aff'd,* 559 F.2d 1203 (2nd Cir.1977), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1970).

■ Section 706(k) of Title VII, 42 U.S. C.A. § 2000e–5 has been interpreted as mandating attorney's fees to prevailing parties unless special circumstances would render such an award unjust. *Albermarle Paper Company v. Moody,* 422 U.S. 405, 98 S.Ct. 1370, 55 L.Ed.2d 657. There being no special circumstances in this case warranting the denial of attorney's fees, the plaintiff's attorneys shall be awarded fees based upon the number of hours used in preparing and arguing the claim, the novelty and complexity of the case, the skill and preparedness of the attorney, the resulting judgment and awards in similar cases. *Taylor v. Safeway Store, Inc.,* 524 F.2d 263, 268 (10th Cir.1975); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). Further, attorney's fees shall be awarded to all attorneys who made a contribution to prosecuting the case. *Reynolds v. Coomey,* 567 F.2d 1166 (1st Cir.1978). Accordingly, plaintiff's attorneys shall submit a statement of reasonable costs and attorney's fees within fifteen days and defendant's attorney shall have fifteen days to make objections or comments. Plaintiff's attorney shall have five days to respond thereafter. If any matter remains unresolved, this Court will set a hearing to determine a reasonable award.

In accordance with the reasoning set out in this Memorandum, an Order will be entered contemporaneously.

---

difference in salaries computed. The dates were August 1, 1977, March 16, 1979, and March 16, 1980. In 1977, Mr. Thompson earned $29 per month more than Dr. Stinson, Dr. Wales made $35 per month more than Dr. Stinson and Mr. Joyner made $313 per month more than Dr. Stinson. Each of these monthly figures was taken and multiplied by 12. The same steps were repeated for salaries in March of 1979 and in March of 1980. The total of the three years indicated that Mr. Thompson earned approximately $2,664 more than Dr. Stinson, that Dr. Wales earned $2,736 more than Dr. Stinson and that Mr. Joyner earned $23,868 more than Dr. Stinson. These three sums were added together which resulted in a total of $29,268. This figure was divided by 3 to determine the average. That figure is $9,756. This computation is designed to "make whole" the plaintiff.