Charles E. **BARNES,**
**Plaintiff-Appellant,**

v.

**YELLOW FREIGHT SYSTEMS, INC.,**
**Defendant-Appellee.**

**No. 84–1793.**

United States Court of Appeals,
Fifth Circuit.

Dec. 19, 1985.

---

Mullinax, Wells, Baab & Cloutman, P.C., Edward B. Cloutman, III, Dallas, Tex., for plaintiff-appellant.

Haynes & Boone, Charles C. Frederiksen, Kenneth E. Broughton, Jr., Dallas, Tex., for defendant-appellee.

Before REAVLEY and E. GRADY JOLLY, Circuit Judges, and MAHON,* District Judge.

E. GRADY JOLLY, Circuit Judge.

Yellow Freight terminated Charles Barnes, a black shift operations manager with nearly seven years service, claiming that he was not performing his job properly. At the same time, Yellow Freight only demoted a white shift operations manager who had an unsatisfactory rating similar to Barnes' and only three years seniority with the company. Barnes claims that the disparate treatment that he received violated his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981. After trial, the district court entered judgment for Yellow Freight and Barnes timely appealed. We vacate and remand the case to the district court for reconsideration.

I.

Barnes was hired by Yellow Freight in 1973. In 1974, he was promoted to dock foreman. In 1978, Barnes received a written performance evaluation of "good" on a scale of poor, fair, satisfactory, good, excel-

* District Judge of the Northern District of Texas, sitting by designation.

lent, and outstanding. Barnes was again promoted in February 1979, this time to shift operations manager at Yellow Freight's Dallas, Texas, facility. His performance ratings in March and August 1979 were "good plus" and "excellent," respectively, on the same scale described above. At all relevant times, Barnes was one of at most three black people in supervisory positions at the Dallas facility out of a total of thirty-two Dallas supervisors, and he was the only black shift operations manager.

In April 1980 Ed Eldridge became the new area manager for Yellow Freight's Dallas plant. A new evaluation scale which rated employees A, B, C, D or F was put into effect almost immediately.[1] Under this new system, Barnes, along with virtually all other supervisors, received a much more critical evaluation than he had in the past. Barnes was rated C-. Twenty-two of the approximately twenty-nine white supervisors were rated either C- or lower.

After April, Barnes and several other supervisors received counselling from their immediate supervisor, Ed Badgett, on difficulties that they were having with the job. The specific complaints about Barnes were that (1) his crews were breaking out freight incorrectly and leaving the dock area cluttered, (2) he failed to make sure that all shipments during his shift had the proper freight bills attached, (3) he had sent some shipments to the wrong destinations, (4) one shipment during his shift had been improperly loaded and the freight damaged, (5) his crews failed to break out the oldest loads first, and finally, (6) he was having difficulty commanding the respect of his crew. Other supervisors, including a white dock foreman named Maury Nixon, had similar problems and received counselling similar to Barnes' in the same few months after April 1980. Nixon, however, had been promoted to shift operations manager in May by Eldridge despite the fact that in April Nixon had received a D rating under Eldridge's new system.

On September 12, 1980, Eldridge, without issuing another formal evaluation or rating and without warning him that his job was in jeopardy, offered Barnes the option of either resigning or being immediately terminated. Eldridge testified at trial that he made the decision to let Barnes go after Barnes' immediate supervisor, Badgett, recommended that Barnes be removed from his position as shift operations manager, and after he had reviewed Barnes' performance since the April 1980 rating. Faced with the decision, Barnes chose to resign.[2] Four days later, Maury Nixon, with a work record similar to Barnes' and with the lower rating, was not discharged but rather demoted back to dock foreman after Eldridge determined that Nixon was not capable of doing the shift operations manager's job.

The district court held that this is a disparate treatment Title VII case that should be analyzed under the guidelines established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The court concluded as a matter of law that Barnes had failed to make out a prima facie Title VII case because he had not proved that he was qualified for the job from which he was discharged. The court concluded in the alternative that even if Barnes had made out a prima facie case of qualification, Yellow Freight had articulated a legitimate, nondiscriminatory reason for discharging Barnes while only demoting the similarly situated white, Nixon,

---

1. Yellow Freight claims, and the district court found, that the company implemented a new, stricter rating system because it was suffering adverse economic effects as a result of deregulation of the trucking industry, and determined that it needed to demand more efficiency from all its employees. We do not disturb this finding.

2. Eldridge testified at trial that he said to Barnes, "It's to your advantage in my opinion for you to go ahead and resign so you can get employment elsewhere before the fact comes down that you are terminated."

i.e., that Nixon had taken the shift operations manager job, for which he proved to be unqualified, at Eldridge's insistence. It then found that Barnes had not discharged his burden of persuasion that Yellow Freight had intentionally discriminated against Barnes because he is black. In the course of reaching its decision, the district court found as a matter of fact that no white supervisor was terminated during the year April 1980 to April 1981, and that Nixon was no better qualified as a dock foreman, the position to which he was demoted, than was Barnes in September 1980.

## II.

The parties agreed with the district court that this is a disparate treatment Title VII case that should be analyzed under the guidelines established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). On appeal, Barnes contends that the district court erred as a matter of law in finding that he did not make out a prima facie case, and that the district court was clearly erroneous in its alternative finding that Yellow Freight had articulated legitimate, nondiscriminatory reasons in response to Barnes' prima facie case. Barnes also alleges that his selection for discharge, rather than transfer or demotion, was racially motivated, and that Yellow Freight has not articulated any reasonable nondiscriminatory reason for discharging Barnes while retaining white supervisors who had work records similar to or worse than Barnes'.

Yellow Freight, on the other hand, submits that the district court's finding that Barnes failed to make out a prima facie case is supported by substantial evidence and should not be overturned on appeal. According to Yellow Freight, there is no evidence that Barnes was qualified for the position of shift operations manager and no evidence that anyone replaced him in that position after he left Yellow Freight; therefore, Barnes did not make out his prima facie case and judgment was properly entered against him. Yellow Freight maintains that since Barnes was no longer qualified to hold the job of shift operations manager, it was justified in terminating him.

Notwithstanding the contentions of the parties, the issue in this case is not whether there were grounds for Barnes' discharge. The district court found, and we agree, that Barnes did not carry his burden of proving that he was qualified for the job from which he was discharged. We presume as well that Nixon was not qualified for the same job since his performance record there was similar to Barnes' and since he was removed for cause by his supervisors at Yellow Freight. The proper analysis of this case does not require asking whether Yellow Freight discriminated against Barnes by deciding that he was unqualified for the job of shift operations manager. The question facing us instead is whether the discipline administered to Barnes, admittedly harsher than that administered to Nixon and other white supervisory personnel, was discriminatory and a violation of Title VII. Yellow Freight admits that the treatment was disparate. It remains for us to determine whether the distinction was racially discriminatory in violation of Title VII.

## III.

In *McDonnell Douglas* the Supreme Court held that a plaintiff may make out a prima facie case of discrimination under Title VII by showing (i) that he belongs to a racial minority, (ii) that he was qualified for the job from which he was discharged or for which he was not hired, (iii) that he was discharged or not hired, and (iv) that the employer filled the position in question with a nonminority person. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6. After the plaintiff makes out the prima facie case, the burden shifts to the defendant employer to articulate some legitimate, nondiscriminatory reason for rejecting the employee. If the employer

meets this test, then the burden returns to the plaintiff to prove that the articulated reason is pretextual.

The *McDonnell Douglas* rule was intended to be a flexible one. The Supreme Court has recognized that the facts of Title VII cases necessarily vary, so the specific prima facie proof that was demanded of the *McDonnell Douglas* plaintiff "is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577–58, 98 S.Ct. 2943, 2949, 5 L.Ed.2d 957 (1978).

██ We agree with the district court that this case should be analyzed under the disparate treatment theory. This is simply not a disparate impact case, where "practices, procedures, or tests neutral on their face, and even neutral in terms of intent" are operating to reinforce an entrenched status quo of discriminatory employment practices. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). In addition, there is not an affected plaintiff class before us, but only one plaintiff, alleging that he was treated differently from other similarly situated employees because they were white and he was black. We conclude that it is appropriate to use a disparate treatment analysis.

██ Although we agree that this is a disparate treatment case, we disagree with the district court's decision to hold Barnes to the *McDonnell Douglas* prima facie proof on job qualification.[3] Whether Barnes was qualified for the job of shift operations manager, as part (ii) of the *McDonnell Douglas* test asks, is irrelevant to a determination of whether Yellow Freight violated Title VII when it discharged Barnes. Also irrelevant is the question, asked in part (iv) of the *McDon-*

*nell Douglas* test, whether Barnes was replaced by a nonminority person. We focus instead on whether Yellow Freight considered mitigating factors in deciding how to discipline Nixon without giving Barnes that same consideration. This issue is not to be resolved on appeal by applying the standard *McDonnell Douglas* framework. We therefore hold that the district court erred when it granted judgment against Barnes on the grounds that he had not made out his prima facie case.

██ There is another reason that we find the *McDonnell Douglas* test inappropriate to the case before us. In *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court held that when a Title VII case has been fully tried on its merits, the appropriate inquiry for the federal courts is not whether the plaintiff has made out a prima facie case, but whether the defendant has discriminated unlawfully against the plaintiff. Once the defendant responds to the plaintiff's proof by offering evidence on the reason for having discharged the plaintiff, the factual inquiry moves to a new level of specificity and the fact-finder must decide whether the rejection was discriminatory within the meaning of Title VII. *Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482. Where a defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. *Id.* Because the procedural posture of Barnes' case is identical to that discussed by the Supreme Court in *Aikens*, our focus must be not on whether Barnes has made out a prima facie case, but on the ultimate factual inquiry whether Yellow Freight intentionally discriminated against Barnes. Thus, what we have before us is a disparate treatment case to which the

**3.** If *McDonnell Douglas* were to be used to analyze this case, the proper focus would be on the job that Barnes was denied, i.e., the dock foreman's job. The district court specifically found Barnes as qualified as Nixon to do the dock foreman's job. It is therefore clear that the job

for which Barnes was qualified and which was denied to him, the dock foreman's job, was filled by a white man, i.e., Nixon. Thus, if the district court had applied *McDonnell Douglas* properly, Barnes would have easily survived the prima facie case requirements of that test.

straight *McDonnell Douglas* analysis does not apply.

■ Since this is a disparate treatment case, however, the plaintiff is still required to prove discriminatory intent. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1045 (5th Cir.1984). This discriminatory intent can be proved either by direct evidence or by circumstantial evidence. *Id.* The intent requirement is an element differentiating the analysis for disparate treatment cases from that of disparate impact cases. Although sometimes either theory may be applied to a given set of facts, disparate impact analysis does not demand that a plaintiff prove discriminatory motive. *Teamsters*, 431 U.S. at 335 n. 15, 97 S.Ct. at 1854–54 n. 15; *Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. Since we hold that this is a disparate treatment case, Barnes must bear his burden of proof on his allegation of Yellow Freight's discriminatory intent. Thus we turn to the question whether Yellow Freight intentionally discriminated on the basis of race.

### IV.

■ A plaintiff alleging disparate treatment in a Title VII action has the burden of proving discriminatory intent. *Burdine*, 450 U.S. at 258, 101 S.Ct. at 1096. The pertinent inquiry is whether the employee's discharge was the result of an even-handed policy applied to white and black employees alike, or was discriminatory because of race.

Intent can usually only be inferred from circumstantial evidence. Today, employers, and their supervisors, who might choose to discriminate on the basis of race have become, as a result of twenty years of Title VII litigation, too sophisticated to use racial epithets or to leave glaring tracks if an employee is being discharged for race-related reasons. Instead, the motive is veiled behind apparently neutral remarks about business necessity, an employee's inadequate performance, attitude and the like.

■ When a supervisor of one race treats employees of the same race more favorably than similarly situated employees of another race under circumstances that are essentially identical, a presumption of discriminatory intent is raised. This presumption arises because we assume that an employer acts on the basis of some underlying reason, either legitimate or not. Consequently, if there is no apparently legitimate reason for a white supervisor's alleged disparate treatment of a black employee, it is more likely than not that the supervisor based the decision on an impermissible consideration such as race. *See Furnco*, 438 U.S. at 577, 98 S.Ct. at 2950.

■ Thus, a court faced with a disparate treatment Title VII case such as this one must often look behind and beyond an employer's words and ask probing questions about the practices of the workplace, seeking out and attempting to resolve any inconsistencies in the manner of dealing with the employee in question. We should not be satisfied with anything less than a probing analysis of the facts if two people of different races, similarly situated, receive different treatment from their employer. The district court accepted Eldridge's explanation that he allowed Nixon, an admittedly unsatisfactory shift operations manager, to take a demotion back to dock supervisor simply because Eldridge "had placed him in that position four or five months previous to that on the spur of the moment." [4] We too can accept Eldridge's explanation for his treatment of Nixon. What we cannot understand is why the same type of lenient standard was not also applied to Barnes, an employee with nearly seven years of above-average service, whom the district court found to be as

---

**4.** Eldridge further elaborated: "I asked Mr. Nixon would you take that position, and he said yes. I gave it to him. A few months later I realized he was not capable of doing the job.

So therefore, I allowed him to move back because I had made the decision. He did not ask for it."

qualified as Nixon to perform the dock foreman job. What troubles us is that Barnes, a black, was harshly disciplined by a white supervisor, while Nixon, a white with a similar, if not worse, work record was leniently disciplined by the same supervisor. Eldridge, it is argued by Yellow Freight, felt a greater personal responsibility to Nixon than to Barnes because it had been his own decision to promote Nixon, whereas Barnes was already a shift operations manager when Eldridge joined Yellow Freight in April 1980. This incomplete explanation leaves unanswered why Barnes, without previous warning that his job was in jeopardy, was summarily discharged without being given any consideration for an alternative like that which was offered to Nixon and which had been offered to other whites in the past; this is made especially troublesome in the light of the district court's finding that Barnes was as qualified to perform the demoted job of dock foreman as was Nixon. In our view, Eldridge's rationale is possibly a veiled expression of generally more lenient standards being applied to white employees than to black employees.

Our concerns become even more bothersome when we consider the evidence offered by Barnes that the district court did not specifically address. In fact, the district court makes no mention of the evidence in the record which indicates the following events:

(1) On January 1, 1976, Ben Dawson, a white shift operations manager, was demoted to dock foreman.[5]

(2) On May 1, 1977, George Patterson, another white employee, was transferred from dock foreman to linehaul dispatcher, remaining at the same hourly wage.

(3) July 10, 1978, Russell Gatling, a white man, was demoted from branch manager to dock foreman. Mr. Gatling was later transferred to city dispatcher, then back to dock foreman, then to chief city dispatcher, and finally, in June 1982, back again to dock foreman.

(4) On November 16, 1982, Billy Price, a white shift operations manager, was demoted to dock supervisor after having been a manager for three years.

The remaining personnel files in evidence are replete with instances of transfers, wage cuts, and demotions. When we combine this evidence with the evidence concerning Mr. Nixon's treatment, we find it nearly impossible to perceive a legitimate business reason for the treatment of Charles Barnes—a seven-year employee at Yellow Freight with a good to above-average work history, who, one day without warning, was told either to quit or be fired.

Eldridge's statement that Ed Badgett, Barnes' immediate supervisor, had requested Barnes' removal, is an incomplete explanation for the apparently disparate treatment accorded Barnes. Furthermore, that Barnes did not request a demotion is an unsatisfactory explanation for Barnes' discharge, because Yellow Freight admits that Nixon also did not request a demotion.

## V.

In conclusion, we hold that the district court was correct in finding Barnes unqualified for the job he was performing, and we do not suggest that the court should order Barnes' reinstatement to the position of shift operations manager. But the district court erred when it dismissed the complaint on the basis of Barnes' lack of qualification as shift operations manager. For the reasons we have stated, the fact that Barnes may have no longer been qualified to perform that particular job does not mean that the company was automatically justified, in view of its record of more lenient discipline for similarly situated whites, in discharging him. We do not hold that the district court was clearly erroneous in finding no intentional discrimination, but we cannot be fully satisfied with that finding until the dis-

---

**5.** Dawson's personnel records indicate that two of the reasons for his demotion were that he did "not push hard enough to obtain production required," and that the company wanted him to "take a firmer stand with all workers, a little soft in those areas." These criticisms are similar to the ones levelled at Barnes before he was asked to leave Yellow Freight.

trict court has reconsidered its findings in the light of this opinion. If Yellow Freight never considered ameliorating the discipline meted out to Barnes, then, in view of the consideration given to Nixon and to other similarly situated white employees as discussed above, Barnes, it would seem to us, has demonstrated that he was discriminated against on the basis of race when the company failed to consider him for a lateral transfer or a demotion. The reason offered for the disparate treatment is very possibly a pretext for racial discrimination. We leave, however, the determination of this question to the district court.

We therefore remand for reconsideration the district court's holding that Yellow Freight did not intentionally discriminate against Barnes on account of his race when it applied a lenient standard and sympathetic consideration to white employees while denying this same consideration to Barnes. The court may choose to rely solely on the present record or it may call for additional evidence or hold further hearings as it deems necessary.

VACATED AND REMANDED.