Paul DANIELS, Plaintiff,

v.

CITY OF ALCOA, et al., Defendants.

No. CIV–3–87–878.

United States District Court,
E.D. Tennessee, N.D.

Decided May 23, 1989.

Supplemental Opinion Sept. 22, 1989.

Peter Alliman and John Carson, III, Lee & Alliman, Madisonville, Tenn., for plaintiff.

Joe Nicholson, Nicholson, Brown & Garner, Maryville, Tenn., and Robert N. Goddard, Goddard & Gamble, Maryville, Tenn., for defendants.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is a civil rights action brought pursuant to 42 U.S.C. §§ 2000e, *et seq.* (Title VII), by the plaintiff Paul Daniels against the City of Alcoa and the Alcoa School System Board of Education, with whom the plaintiff had been employed as a band director. The plaintiff (a black male) alleges that he was subjected to disparate treatment as compared to two white teachers in similar circumstances. A bench trial was held on April 24 and 25, 1989. This Opinion constitutes the findings of fact and conclusions of law of the Court under Rule 52(a), Fed.R.Civ.P.

## I. FACTS

The plaintiff is a 1971 graduate of East Tennessee State University, from which he obtained a Bachelors of Science in Music Education, and of the University of the District of Columbia in 1979, with a Masters of Arts in Administration and Supervision. [Ex. 1.] He taught school in the District of Columbia from 1973 to 1980. In July, 1981, the plaintiff applied for a position with the Alcoa City School System. [Ex. 17.] On August 4, 1981, he was interviewed by members of the school system for consideration as the band director [Ex. 19] and the decision was subsequently made to hire the plaintiff. [Ex. 20.] A contract of employment for the 1981–1982 academic year was executed on August 18, 1981, by the defendants and accepted by the plaintiff on September 3, 1981. [Ex. 16.] The plaintiff performed his duties as band director throughout the 1981–1982 academic year and the evidence is clear that his level of performance was certainly above average, apparently generating substantial student enthusiasm and parental support for the band. The personnel evaluations of the plaintiff reflect satisfactory or outstanding performance in virtually every category of the evaluation; adversely critical comments about Mr. Daniels' teaching abilities were minimal. [Exs. 21, 22, 23, 24, and 25.] The school system was sufficiently satisfied with Mr. Daniels' work that the Board of Education reelected him on an annual contract to the same teaching position for the 1982–1983 academic year.[1] [Ex. 6.]

On July 7, 1982, during the summer break between the 1981–1982 and 1982–1983 academic years, the plaintiff attended a high school music competition held in Sevierville to get some ideas for his own band projects in the Alcoa School System. On the night of July 7, a friend of Mr. Daniels, Arthur Burke, who was staying with him temporarily, drove the plaintiff to Sevierville for the show in Mr. Daniels' car. The plaintiff allowed Mr. Burke to use his car from time-to-time and had allowed him to do so on this evening while he attended the music competition. Mr. Daniels testified that during an intermission in the program, he went to a rest room where he inadvertently discovered two students smoking marijuana; he confronted the students, informing them of who he was, and confiscated two marijuana cigarettes from

---

1. The plaintiff had not yet achieved tenured status with the defendant. *See* T.C.A. secs. 49–5–501(11), 49–5–503, and 49–5–504. He was, therefore, on a yearly contract.

them. Instead of destroying these cigarettes, however, Mr. Daniels placed them in his shirt pocket and returned to watch the remainder of the program, forgetting about the cigarettes. The plaintiff testified that he did not report the incident to anyone because he had no authority in Sevierville, did not know the local teachers or administrators, saw no police, and was the only black person present at the show, which made him feel hesitant to report the students.

When the program was over, Mr. Burke picked the plaintiff up and they returned to Knoxville. At about 11:00 p.m., Mr. Daniels visited the home of another Alcoa teacher, Mrs. Bernice Kennedy, where he ate a late dinner and had two drinks with Mr. Kennedy. Between 12:30 a.m. and 1:00 a.m., July 8, he left Mrs. Kennedy's house to drive home a short distance away. On his way, he was stopped by a Rockford police officer, who smelled alcohol on his breath and accused him of driving under the influence. The plaintiff was arrested and charged with driving under the influence; a search incident to his arrest produced the two marijuana cigarettes and he was also charged with possession of a controlled substance. A toxicology examination was conducted and showed that he was intoxicated with neither alcohol nor marijuana, among other drugs for which the test was run. [Ex. 4.] The Court notes here that the evidence at trial demonstrates that the plaintiff does not use marijuana.

The next morning, the plaintiff called the superintendent of schools, Dr. William C. Helton, to talk to him about the incident. Dr. Helton was already aware of the arrest. The plaintiff testified that Dr. Helton was hostile and suggested that he resign. Dr. Helton verbally suspended him on the phone and subsequently sent a letter to him, dated July 8, 1982, informing him that he would be suspended without pay "until such time as this matter and these charges can be resolved." [Ex. 26.] The plaintiff then obtained an attorney and met with Dr. Helton and other members of the school system on July 14, 1982, at which time he was informed of his right to a hearing. [Ex. 27.] On July 22, 1982, the plaintiff formally requested a hearing before the school board. [Ex. 28.] An administrative hearing was scheduled by Dr. Helton for September 15, 1982. [Ex. 29.]

On July 28, 1982, the plaintiff's State criminal charges were heard in the General Sessions Court for Blount County. The driving while intoxicated charge was dismissed and a fine of $25.00 was assessed on the misdemeanor charge of possession of a controlled substance. [Ex. 35.] The plaintiff then appealed his conviction to the Circuit Court for Blount County for a *de novo* disposition of the charge in that court. [Exs. 4, 9.] During the pendency of this appeal, the defendants held an administrative hearing as scheduled, despite the fact that the disposition of the misdemeanor charge was not yet final. On September 21, 1982, the Alcoa City Board of Education (the Board) met in regular session at which Dr. Helton preferred written charges against the plaintiff and recommended his dismissal from his teaching position. The plaintiff's State criminal charges were still pending at the time of this hearing. Subsequently, Dr. Helton informed the plaintiff of the Board's decision to dismiss him in a letter dated September 22, 1982, which also gave the plaintiff notice of his right to a hearing before the Board. [Ex. 30.] By a letter of September 29, 1982, the plaintiff demanded a hearing before the Board. [Ex. 31.]

This hearing was held on October 12, 1982. [Ex. 11.] The charges against the plaintiff were (1) unprofessional conduct due to the pending criminal charge for possession of a controlled substance, (2) incompetency and inefficiency, also due to his possession of a controlled substance because it affected his status as a role model and his ability to act as an effective disciplinarian, and (3) breach of the employment contract due to an alleged failure to comply with the fiscal policies of the Board as well as his possession of a controlled substance. The fiscal policy infraction concerned failure to comply with purchasing requirements for expenditures exceeding a certain amount and obligating funds from one school year to the next. The plaintiff's testimony at the hearing before the Board is consistent with that at the trial of this case. The Board voted 4-to-1 to dismiss

the plaintiff. [Ex. 33.] The plaintiff then filed a petition for a writ of certiorari with the Chancery Court for Blount County, which upheld the Board's action. The dismissal was retroactively effective to July 8, 1982.

The *de novo* disposition of the plaintiff's misdemeanor charge resulted in a pretrial diversion of the charge by the District Attorney General in November, 1982, a short time after the Board took its final action to dismiss the plaintiff. [Ex. 4.] The diversionary period terminated on November 9, 1983, and the charge was dismissed with prejudice on February 9, 1984. On April 30, 1984, the plaintiff's criminal records were ordered expunged. [Exs. 9, 10, and 13.] [2]

On March 15, 1983, the plaintiff filed a charge of discrimination with the Tennessee Human Rights Commission (THRC) and the Equal Employment Opportunity Commission (EEOC). [Exs. 5, 12.] Although resisted by the defendants, the THRC conducted its investigation and on January 12, 1987, it made a determination that the defendant subjected the plaintiff to disparate treatment because it failed to take similar disciplinary actions against two white teachers who had been charged with misdemeanors (shoplifting and driving under the influence of an intoxicant) and whose charges were in one instance disposed of by a guilty plea and the other disposed of by pretrial diversion as well.[3] A right-to-sue letter was issued to the plaintiff by the EEOC on September 23, 1987, and on December 14, 1987, this Title VII action was filed. [Ex. 34.]

The evidence concerning disparate treatment shows that a white female teacher in the Alcoa School System was arrested for

shoplifting in July, 1978. By a letter dated August 18, 1978, Dr. Helton suspended her without pay "pending final disposition of the case." [Ex. 3.] Subsequently, on October 17, 1978, the defendants' attorney advised Dr. Helton that "[t]he prosecution of this case was placed on a diversionary program and was terminated on October 6, 1978," and that the teacher's records would be expunged; no determination of guilt or innocence was made. This teacher was subsequently allowed to return to her teaching position. Another white teacher was arrested for driving under the influence of an intoxicant following an automobile accident in which personal injury to another occurred. [Exs. 2, 7.] She was arrested and charged on November 5, 1981. On March 23, 1983, after several continuances, she entered a plea of guilty to the charge in the General Sessions Court for Knox County. Nevertheless, the defendants did not suspend her after discovering the existence of the charge on August 9, 1982, and merely gave her a verbal reprimand on September 21, 1982, prior to any final disposition of the charge by a conviction.

Dr. Helton testified that each such case is treated individually. He was concerned in the plaintiff's case because drugs were involved. He did not believe that the plaintiff could continue as a teacher because he would not be a good role model and would no longer be an effective disciplinarian, reducing his efficiency. Although the two white teachers were not as severely disciplined, Dr. Helton considered their circumstances to be sufficiently different because their effectiveness as teachers was not undermined. In addition, the plaintiff was charged with violating the school's fiscal policy.[4] More publicity surrounded the

---

**2.** On October 19, 1982, the plaintiff filed for unemployment compensation, which was initially denied; however, an administrative appeal eventually resulted in a finding of eligibility because no work-related misconduct by the plaintiff had occurred and the employer had not been damaged by the plaintiff's conduct. [Ex. 8.]

**3.** Following the initiation of the THRC investigation, the job description for the band director was rewritten by the defendants and submitted in response to a request for information by the

THRC. Further evidence of the defendants' resistance to the THRC investigation is found in the State court litigation between the defendants and the THRC over THRC access to school personnel records. *See THRC v. Alcoa City Schools,* slip opinion, 1986 WL 2145 (Tenn.App., Eastern Section, Sanders, J., February 12, 1986) [Ex. 15].

**4.** The evidence is clear that the fiscal policy was observed as much in its breach as in its enforcement. [Ex. 11, at pp. 84–96, pp. 123–125; trial testimony of Dr. Helton and of Clint Abbott, Jr.]

plaintiff's arrest as well. Taking the situation as a whole, Dr. Helton determined that the plaintiff could not continue as a teacher in the school system, but the other two teachers' effectiveness had not been similarly affected by their charges. When pressed to compare the misdemeanor charges against these three teachers, Dr. Helton did concede that the possession of drugs and driving under the influence were more serious than shoplifting. Nevertheless, the charge of driving under the influence was a first offense and did not of itself justify dismissal, but to him possession of marijuana and driving under the influence were not the same. The Alcoa High School principal, Clint Abbott, testified that in comparing the three offenses, shoplifting was less serious than DUI or possession but as between DUI and possession, DUI was a fairly serious violation, although not as serious to him as possession.

Following the plaintiff's dismissal by the Board, a black woman, Jacki McClary, ran for a position on the Board, in part due to concerns raised by the plaintiff's dismissal and also to support a more effective affirmative action program for hiring minority teachers.[5] She was concerned that the faculty did not reflect the racial composition of the student body. She was elected to the Board in an at-large election. Other witnesses also testified concerning community support for the plaintiff. These witnesses demonstrated that community support for the plaintiff was significant and that his arrest had not had an adverse effect on his reputation. The defendants did not produce any substantial evidence that contradicted these witnesses. Moreover, several of these witnesses were also teachers and they did not believe that the plaintiff's ability to perform as a teacher would have been compromised under the circumstances. Some of these teachers testified that the charges against the two

Moreover, absent the charge for possession of marijuana, Dr. Helton testified that no recommendation to discharge would have been made on the basis of the fiscal policy violation alone.

**5.** Minority hiring in the Alcoa School System had been the subject of a Department of Health,

white teachers resulted in no apparent detriment to their efficiency as teachers.

## II. LAW

### A. Prima facie case

■ The plaintiff has clearly presented a *prima facie* case. *See Daniels v. Board of Education*, 805 F.2d 203, 207–208 (6th Cir. 1986); *Morvay v. Maghielse Tool and Die Company*, 708 F.2d 229, 233 (6th Cir.1983). As this Court found in its Memorandum Opinion denying the defendants' motion for summary judgment [Doc. 24], the plaintiff has demonstrated that he is a member of a protected class, that he was treated differently from other similarly situated white employees by being discharged for having been charged with a misdemeanor when two other white employees charged with or convicted of misdemeanors were not as severely disciplined, and that he was qualified for the position from which he was discharged, The Supreme Court of the United States has recognized that "[t]he burden of establishing a *prima facie* case of disparate treatment is not onerous." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Consequently, the establishment of a *prima facie* case raised "a presumption that the employer unlawfully discriminated against the employee." *Id.*, at 254, 101 S.Ct. at 1094. The burden of production of evidence, but not the ultimate burden of persuasion, therefore, shifted to the defendants "to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] ... for a legitimate, nondiscriminatory reason," *id.* Nevertheless, "[t]o prevail under the disparate treatment theory, a plaintiff must show that he has been the victim of intentional discrimination." *Daniels, supra*, at 206.

Education and Welfare study in 1978; HEW found inadequate minority representation. Since that study, minority representation has dropped, apparently at least in part due to attrition.

**B.** *Defendants' explanation for its treatment of the plaintiff*

The plaintiff's evidence shows that the defendants discharged him because he was charged with, but not convicted of, a misdemeanor offense of possession of a controlled substance. Two white teachers charged with or convicted of misdemeanors were less severely disciplined. Before addressing the defendants' justification for their decision to terminate the plaintiff, the Court will discuss the three misdemeanors involved.

In one situation, a white teacher was arrested for shoplifting; she was suspended without pay until the final disposition of the charge, after which she was permitted to return to her position; her charge was disposed of by pretrial diversion and her records expunged. Shoplifting is defined and punishable under T.C.A. § 39-3-1124; the first and second offenses are misdemeanors, punishable by a fine of up to $300.00 for the first offense with the possibility of imprisonment up to six (6) months and, for the second offense, by a fine of up to $500.00 with the possibility of imprisonment up to one (1) year. The third offense is a felony.

Subsequently, another white teacher was arrested and convicted of driving under the influence of an intoxicant following an accident in which injury to the person of another occurred. This teacher was not suspended and received only a verbal reprimand. The offense of DUI is controlled by T.C.A. §§ 55-10-401, *et seq.*, which defines exacting punishments. At the time of this teacher's arrest for DUI, the mandatory sentencing provisions of T.C.A. § 55-10-403 were not in effect; however, the Court notes that in 1982 the Tennessee Legislature enacted a stringent statutory scheme controlling punishment in DUI cases. *See* 1982 Public Acts, ch. 891. This scheme recognizes the seriousness of the offense but it is nevertheless treated and punished as a misdemeanor. Presently, three levels of punishment exist, depending on whether the person has prior convictions for DUI, with sentences ranging from a mandatory minimum of 48 hours in jail for the first offense (with longer minimums for the next two subsequent offenses) to a maximum of 11 months, 29 days, and fines from a minimum of $250.00 to $5,000.00. The offender's drivers license is also suspended for not less than one (1) year and up to ten (10) years.

The offense for which the plaintiff was arrested was simple possession of marijuana. T.C.A. § 39-6-417(b)(1). Marijuana is treated, for most purposes, as a schedule VI drug under the Tennessee Drug Control Act, T.C.A. §§ 39-6-401, *et seq.* Simple possession is a misdemeanor; the first offense is punishable by a sentence of up to 11 months, 29 days and a fine of no more than $1,000.00. Only the third and subsequent offenses are treated as felonies. In this regard, the Tennessee Supreme Court has recognized that the legislature's treatment of simple possession "reflects a legislative intent to punish more harshly those persons who traffic in drugs than one simply possessing them for his or her own use." *State v. Holt*, 691 S.W.2d 520, 521 (Tenn.1984).

Finally, in the context of this case, the Court finds that a brief examination of the policy of pretrial diversion is necessary as well. Under T.C.A. §§ 40-15-102, *et seq.*, certain offenses may be placed on pretrial diversion. The Tennessee Court of Criminal Appeals has described persons eligible for pretrial diversion of such criminal charges as those "whose criminal conduct is uncharacteristic of [their] prior social history, who [have] demonstrated in some manner an ability to undertake and carry through on the ordinary obligations of the society, and who [have] a present ability and incentive to act within the law without the deterrent effect of a public trial." *State v. Nease*, 713 S.W.2d 90, 92 (Tenn.Cr. App.1986). The effect of pretrial diversion is to place these offenders outside " 'the normal criminal process,' " *Blackwell v. State*, 605 S.W.2d 832, 833 (Tenn.Cr.App. 1980) (citation omitted), and consequently "[b]y deliberate design, invocation of the diversion statute avoids the consequences of a public prosecution and conviction, and thus any 'deterrent effect' on others in the community is intentionally minimized or eliminated." *Id.*, at 834. In short, pretrial diversion is intended to spare certain of-

fenders from suffering the stigma and consequences of a criminal conviction as the public policy of the state. *Id.*, at 835. *See also Pace v. State*, 566 S.W.2d 861 (Tenn. 1978).

Moreover, the law of Tennessee makes "no clear distinction ... between small offenses and misdemeanors of higher degree," *Spurgeon v. Worley*, 169 Tenn. 697, 90 S.W.2d 948, 950 (1936), but the severity of punishment, both as to minimum and maximum limits, does evidence legislative policy concerning the seriousness of the offense. Regardless, the status of a misdemeanant in Tennessee cannot be differentiated on the basis of the inherent nature of the offense itself. This Court can find no Tennessee law and was not pointed to any Tennessee law that would permit an offense for simple possession of marijuana to be considered more serious than DUI. Of the three misdemeanors involved, all apparently first offenses, the legislative policy evidenced by the contrast between the present DUI statute and the prior statute makes clear the seriousness of the misdemeanor offense of DUI; moreover, the DUI and pretrial diversion statutes except DUI offenses from eligibility for diversion. T.C.A. §§ 40–15–105(a)(1), 55–10–403(b)(1).[6] Further, unlike DUI, neither shoplifting nor simple possession of marijuana carry minimum fines or terms of confinement.

In light of these observations, the Court next turns to evaluate the defendants' decision to discharge the plaintiff on the basis of his arrest for simple possession of marijuana. The Court finds it particularly ironic and extremely troubling that the disciplinary action taken by the defendants was more severe in the cases of shoplifting and simple possession of marijuana than in the case of a DUI offense, the most serious charge of the three. Although the defendants contended that distinctions could be drawn among the three offenses and that they did not discover the DUI offense until

sometime after the teacher's arrest (but before her conviction), the defendants treated the two white teachers significantly less severely than the plaintiff.

One of the reasons advanced by the defendants was that the plaintiff had been convicted in General Sessions Court, while the shoplifting offense had been placed on pretrial diversion prior to any determination of guilt or innocence in any court. This justification is unpersuasive, however, because the DUI charge had been reduced to a conviction, but that teacher was only verbally reprimanded, and, more importantly, because an appeal from a decision in General Sessions Court to Circuit Court provides for *de novo* disposition as if no prior adjudication had occurred, making that conviction a legal nullity. *See Doster v. State*, 195 Tenn. 535, 260 S.W.2d 279, 280 (1953) ("The expression 'hearing *de novo* in the Circuit Court' means 'as though the suit originated in the Circuit Court'"). *Cf. Cooper v. Williamson County Board of Education*, 746 S.W.2d 176 (Tenn.1987) (meaning of trial *de novo* discussed). Furthermore, both the shoplifting offense and the plaintiff's charge of simple possession were placed on pretrial diversion. To allow the plaintiff to suffer consequences that might otherwise flow from a conviction would defeat the clear public policy established by the pretrial diversion statute. In addition and of particular significance, the defendants waited until the *de novo* disposition of the shoplifting charge before deciding what action to take against that teacher, but did not delay its decision pending the *de novo* disposition of the plaintiff's charge before terminating him.

The defendants also contend that drug possession of itself is so serious in view of the pervasive problem of drugs in society in general and in schools in particular that this disparity in treatment was justified.

**6.** In *Blackwell, supra*, at 834, decided in 1980 prior to the 1982 amendment of the DUI statute, the Court of Criminal Appeals held that DUI offenses were not exempted from the diversion program provisions; this is no longer the case. Moreover, unlike shoplifting and drug offenses, the Sentencing Reform Act of 1982, T.C.A. secs.

40–35–101, *et seq.*, does not apply to DUI cases. *See State v. Sanders*, 735 S.W.2d 856 (Tenn.Cr. App.1987); *State v. Gurley*, 691 S.W.2d 562 (Tenn.Cr.App.1984). This exceptional treatment of DUI cases clearly manifests a legislative policy treating DUI offenses more seriously than other misdemeanors.

Not only is the Court convinced that the plaintiff does not use marijuana and obtained the marijuana in an effort to enforce the very policy that the defendants used to justify his termination, but the statutory scheme controlling DUI offenses and its exceptional treatment as a criminal offense in Tennessee demonstrate that it is certainly as serious as, if not more serious than, simple possession of marijuana.[7] The plaintiff would have been well-advised to have destroyed the marijuana cigarettes when he confiscated them, but he did not possess them because he used the drug in any case. Regardless, the charge was a first offense and the defendants never offered any reasonable explanation concerning why the two white teachers were given second chances but the plaintiff was not. Alcohol use by teenagers and probably shoplifting are certainly significant current social problems as well; yet the DUI offender was given the least severe punishment of the three, despite that teacher's admission to Dr. Helton that she had indeed committed the offense.

Clearly, the plaintiff was treated differently from other teachers in similar circumstances and this disparate treatment is not adequately justified or explained by the defendants on the record before this Court. The Court concludes that the defendants failed to apply the same criteria to the plaintiff as they did to the other two teachers in making the decision to discharge him. As the United States Supreme Court emphasized in *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 283, 96 S.Ct. 2574, 2580, 49 L.Ed.2d 493 (1976), such criteria "must be 'applied alike to members of all races,' and Title VII is violated if … it was not." (Citation omitted.) This Court can express no opinion as to whether misdemeanor offenses justify termination from a teaching position, but the failure of the defendants to treat the plaintiff in the same manner as other teachers in a similar circumstance manifestly resulted "in retaining guilty employees of one color while discharging those of another color." *Id.*, at 284, 96 S.Ct. at 2580. The law is firmly estab-

lished "that Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 801, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

## C. Pretext

Given the defendants' failure to justify their decision to terminate the plaintiff, the only conclusion that this Court can reach on this record is that the proffered reasons for the plaintiff's discharge were a pretext for intentional discrimination. No "legitimate, nondiscriminatory reason for the adverse action," *Daniels, supra*, at 207, has been advanced by the defendants; the reasons advanced simply fail to withstand even superficial examination. Although the Court cannot conclude from the evidence on this record that the defendants have necessarily engaged in a general pattern or practice of discrimination, the Court is convinced " 'that a discriminatory reason more likely motivated the [defendants],' " *id.* (quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095), in their treatment of this particular plaintiff.

Mr. Daniels was an obviously qualified teacher but, unlike two white teachers accused or convicted of misdemeanors, he was not given a second chance and no State law justifies differentiating among misdemeanors. The defendants admitted that they would not have discharged the plaintiff for his alleged violations of the school's fiscal policies and thus the addition of this reason to the defendants' justification does not provide further support for their termination decision because the decision was not justified in any case based on the misdemeanor charge against the plaintiff. Rather, inclusion of the fiscal policy charge merely bolsters the plaintiff's contention that the reasons given by the defendants for his discharge were a pretext for discrimination. That the defendants used the fiscal policy violations in addition to the misdemeanor charge to justify the plaintiff's discharge when it would not have done so otherwise supports the inference

---

7. In this regard, the General Sessions Court assessed a fine of only $25.00, reflecting its judgment of the seriousness of the offense in the plaintiff's case.

that "the employee's discharge was [not] the result of an even-handed policy applied to white and black employees alike...." *Barnes v. Yellow Freight Systems, Inc.*, 778 F.2d 1096, 1101 (5th Cir.1985). As the Fifth Circuit observed in *Barnes*, "[w]hat we cannot understand is why the same type of lenient standard was not also applied to [the plaintiff]...." *Id.*

When the Court considers all of the evidence before it concerning the conduct of the defendants toward the plaintiff, the conclusion that racial discrimination motivated the defendants' decision to discharge him is compelling. The reasons offered by the defendants were unpersuasive and the plaintiff's proof adequately demonstrates that they were a mere pretext for intentional racial discrimination. *See Stinson v. Tennessee Department of Mental Health*, 553 F.Supp. 454, 474 (M.D.Tenn.1982).

### III. RELIEF

■ The next aspect of the case for the Court's consideration is the relief to which the plaintiff is entitled under 42 U.S.C. § 2000e–5(g). Title VII remedies are equitable in nature, *Albemarle Paper Company v. Moody*, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975), but "the purpose of Title VII [is] to make persons whole for injuries suffered on account of unlawful employment discrimination." *Id.*, at 418, 95 S.Ct. at 2372. The plaintiff was paid under his 1981–1982 contract on a ten (10) month basis from August 18, 1981, through May 27, 1982. [Ex. 16.] He was also paid for work performed on July 5, 6, and 7, 1982. [Ex. 1.] The proof does not demonstrate how much, if any, he would have earned for any further work he might have performed during the remainder during the summer of 1982, however. In the defendants' answers to the plaintiff's second set of interrogatories [Doc. 20], the amount of the plaintiff's salary for the 1982–1983 contract year was to have been $22,899.92. Because the plaintiff was on a yearly contract and was not tenured at the time of his discharge, the Court is of the opinion that an award of back pay must be limited to the term of his 1982–1983 contract; moreover, reinstatement would not be appropriate for the same reasons and

the Court declines to order reinstatement based on the equities of the case. At the time of trial, seven years after his termination, the plaintiff was employed at Knoxville College as a teacher. Subsequent to his termination, however, the plaintiff was unable to secure employment for some period. Regardless, the defendants failed to carry their burden to show that the amount of damages should be reduced by any interim earnings or due to any alleged lack of diligence in securing employment of a comparable nature. *E.g., Hartman v. Wick*, 678 F.Supp. 312, 338 (D.D.C.1988). Under all the circumstances of this case, the Court does conclude, however, that an award of prejudgment interest would be equitable. *See Glus v. G.C. Murphy Company*, 629 F.2d 248, 258 (3rd Cir.1980), *cert. denied* 449 U.S. 949, 101 S.Ct. 351, 66 L.Ed.2d 212, *vacated* 451 U.S. 935, 101 S.Ct. 2013, 68 L.Ed.2d 321, *on remand* 654 F.2d 944 (3rd Cir.1981). This interest is to be calculated from the date of the determination of the Tennessee Human Rights Commission that the defendants discriminated against the plaintiff.

### IV. CONCLUSION

Accordingly, the Court ORDERS:

1. That the plaintiff is AWARDED back pay in the amount of $22,899.92;

2. That the plaintiff is AWARDED prejudgment interest dating from January 8, 1987, plus the cost of this action, together with reasonable attorney fees; and

3. That the plaintiff's attorney is DIRECTED to file his lodestar affidavit by 5:00 p.m., Friday, June 2, 1989.

### SUPPLEMENTAL OPINION

This Title VII Civil Rights case was tried on April 24 and 25, 1989, and the Court entered a Memorandum Opinion [doc. 38] and Order [doc. 39] awarding judgment to the plaintiff in the amount of $22,899.22 on May 23, 1989. The plaintiff then filed a motion to alter or amend the judgment [docs. 42, 42A], to which the defendants responded [doc. 45]; the defendants also filed a motion for relief from the judgment

[docs. 46, 46A], to which the plaintiff responded [doc. 48]. Both motions concern the appropriate relief to be awarded in this case and both parties requested a hearing on this issue. The Court set the matter for an evidentiary hearing on August 7, 1989 [doc. 49], directing the parties to file supplemental briefs precisely defining the issues to be decided.

Fundamentally, the plaintiff contends that the award of back pay should extend beyond the period of the one-year contract he had with the defendants, that he should be reinstated to his former position, or, alternatively, that he should receive front pay for five years in lieu of reinstatement. The plaintiff argues that these remedies are required to make him whole for the injury he suffered as a result of the defendants' discrimination. Conversely, the defendants take the position that any award of relief extending beyond the contract year would be entirely speculative, as the plaintiff was not tenured, that reinstatement would displace the person presently in the plaintiff's former position as band director, and that any award of front pay in lieu of reinstatement should be limited to one year. In addition, the defendants contend that the plaintiff failed to mitigate his damages or to exercise due diligence in obtaining employment and that any additional award should be reduced by the amount the plaintiff has earned since his termination.

At the hearing on relief, the plaintiff testified that following his termination, he made a claim for unemployment compensation and immediately began looking for employment. He applied for positions on the faculties of several area colleges as well as for positions with social services agencies of various kinds. He contacted a number of local school systems and went to a private employment service. [Exs. 10, 11.] In July, 1983, Mr. Daniels also initiated the process of becoming a licensed real estate broker but did not obtain his license. [Ex. 13.]

In 1983, he was able to substitute as a teacher in the Knoxville City Schools. [Ex. 12.] He eventually took a full-time position in Nashville as a contracts administrator with Phoenix Fuels in late 1983, but did not file an income tax return for that year because he made less than $3,300.00. Since his termination by the defendants, the plaintiff testified that he has been engaged in a virtual constant search for appropriate employment. In 1984, he left Phoenix Fuels to work for the Tennessee Valley Energy Coalition so he could return to the Knoxville area. Continuing to try to supplement his income with part-time work, he obtained positions performing temporary work. [Ex. 14.] Eventually he became a bellman at the Holiday Inn World's Fair in 1985, while continuing to work for the Tennessee Valley Energy Coalition. [Ex. 15.]

After receiving a number of verbal and written rejections for positions in education during the 1983–1984 period, he temporarily stopped applying for these positions. In 1986, his main source of income was his employment with Holiday Inn. [Ex. 16.] By 1987, he considered returning to searching for work in education and again worked for the Knoxville City Schools as a substitute teacher. [Ex. 17.] In June, 1987, Knoxville College hired him as the band director, where he is currently employed. [Ex. 18.]

The plaintiff also testified that he did not attempt to give private music lessons because he did not think, based on his prior experience in offering such lessons, that he could make a living at it. Moreover, he stated that had he worked during the 1982–1983 contract year he would have been entitled to a supplement of $2,167.92 in addition to his base salary of $20,732.00, which totals $22,899.92, the amount awarded by this Court in its original Opinion. He stated that he would like to return to his position with the Alcoa City School System because the pay is higher than average, the opportunity is good, and he enjoyed working with the student body.

On cross-examination, he stated that he is not currently looking for employment and that he enjoys his present position at Knoxville College. He presently earns about $21,000.00 a year but his benefits are minimal and include a week's vacation and sick leave. However, he has no retirement

plan. He does not want to relocate to another State. Some of his contacts with school systems were oral and not written because he was discouraged by the responses he received from oral inquiries and did not always follow-up with a written application. Often these verbal responses mentioned his discharge from the Alcoa City School System as a cloud on his record.

The defendants' proof consisted of the testimony of William C. Simons, Jr., the present superintendent of the Alcoa City School System. He testified that advancement on the Tennessee teachers' career ladder is not guaranteed by eligibility, with only about ten percent of the teachers who apply achieving it. He explained the benefits received by teachers and how they are funded by the State and local system and when retirement benefits vest, which is only upon eligibility for retirement itself. If a person leaves the system before retirement eligibility, the person's contributions but not the State's are refunded. Furthermore, when asked about whether the school system would be hostile to the plaintiff's reinstatement, Mr. Simons stated that the plaintiff's marijuana charge was a problem but that he had no personal animosity towards him.[1] In addition, Mr. Simons testified that the plaintiff's former position as band director has been filled and that music education has been reorganized since the plaintiff's termination in 1982.

■■■■ Before addressing the other issues, the Court specifically finds that the plaintiff did not fail to mitigate his damages and exercise due diligence in attempting to secure suitable employment. *See, e.g., Helbling v. Unclaimed Salvage & Freight Company,* 489 F.Supp. 956, 964 (E.D.Penn.1980). A person is not required to travel unreasonable distances from the place of residence to find another comparable position to that lost as a result of unlawful discrimination. Similarly, a person cannot be required to relocate for this purpose. Nor is a person required to take a position unrelated to skills, education, or training. All that is required is that the victim of discrimination use reasonable diligence in finding other suitable employment. *Ford Motor Company v. Equal Employment Opportunity Commission,* 458 U.S. 219, 231, 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721 (1982).

The Court recognized in its original Opinion that the guiding policy of Title VII is that successful plaintiffs be made whole, citing *Albemarle Paper Company v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). *See also Gutzwiller v. Fenik,* 860 F.2d 1317, 1333 (6th Cir.1988). Moreover, *Albemarle* established a presumption in favor of retroactive relief that cannot ordinarily be overcome. *City of Los Angeles, Department of Water and Power v. Manhart,* 435 U.S. 702, 719, 98 S.Ct. 1370, 1380, 55 L.Ed.2d 657 (1978). Nevertheless, *Manhart* recognized that the district court retains the discretion to make a case-by-case determination of what relief is appropriate, explicitly emphasizing the equitable nature of Title VII remedies. *Id.,* at 718–719, 98 S.Ct. at 1380–81. The Sixth Circuit has restated this interpretation of Title VII when it held that "the scope of [a Title VII] remedy rests within the discretion of the district court." *Henry v. Lennox Industries, Inc.,* 768 F.2d 746, 752 (6th Cir.1985). The Court is, of course, guided by the decisions of the Sixth Circuit and of the United States Supreme Court.

## I. *Back Pay*

Based on its assessment of the equities in this case, the Court has already awarded the plaintiff $22,899.92 in back pay, which represents his salary of $20,732.00 for the 1982–1983 contract year, plus his band director's supplement of $2,167.92. The plaintiff contends that the award of back pay should extend beyond this contract year to include his salary and supplement for every year through 1988–1989, relying

---

**1.** The Court notes here that this issue has been settled. The Court thoroughly discussed the effect of pretrial diversion in its original Opinion [doc. 38, at pp. 17–23] and reiterates that the plaintiff's "conviction" in General Sessions Court cannot be used against him by virtue of the *de novo* disposition of that charge; moreover, the plaintiff's records have been expunged pursuant to the diversion statute.

on *Edwards v. School Board of the City of Norton*, 658 F.2d 951 (4th Cir.1981), and *Edwards v. Gladewater Independent School District*, 572 F.2d 496 (5th Cir.1978) (*per curiam*). Both the *Edwards* cases involved non-tenured teachers in Title VII cases; both were awarded back pay extending beyond the year of their contracts of employment.

The defendants argue that the case law is not consistent on this point but also insist that the plaintiff has been made whole through the Court's award of back pay limited to the contract year. The defendants rely on *United States v. Georgia Power Company*, 474 F.2d 906 (5th Cir. 1973). The *Georgia Power* case reiterated the equitable nature of Title VII remedies, *id.*, at 921–922, and the Court of Appeals observed that the plaintiff was required to show that he " 'was ordinarily entitled to the wages in question and ... would have received them in the ordinary course of things but for the inequitable conduct of the party from whom the wages are claimed.' " *Id.*, at 922 (citation omitted).

As far as this Court can discover, the Sixth Circuit has not spoken on the precise issue of whether back pay should extend beyond the term of a contract for a non-tenured teacher. Of course, general guidance on the fashioning of relief in Title VII cases does exist in this Circuit. *E.g., Gutzwiller, supra; Rasimus v. Michigan Department of Mental Health*, 714 F.2d 614 (6th Cir.1983). Both *Gutzwiller* and *Rasimus* state essentially the same considerations. Back pay should account for salary, sick leave, vacation pay, pension benefits and other fringe benefits. 860 F.2d at 1333. Moreover, back pay should be denied only for reasons that would not frustrate Title VII's deterrent purposes. 714 F.2d at 626. It should be awarded even if it cannot be precisely determined. *Id.*, at 628.

The Court remains convinced that, absent any guidance from the Sixth Circuit,[2] the plaintiff's back pay should be limited to the term of his contract. By awarding back pay limited to this amount, the plain-

tiff is made whole for the only reasonable expectation he could have had—that he would be paid for the term of the renewed contract. Awarding an extensive period of back pay running beyond that contract would be speculative. *See Shore v. Federal Express Corp.*, 777 F.2d 1155, 1160 (6th Cir.1985).

 Some adjustment to the award is, however, appropriate based on the evidence submitted at the August 7 hearing. Although the Court does not find that the amount of retirement benefits should be awarded, since the State's contribution does not vest until reaching eligibility for retirement and the employee's contributions are refunded if the employee withdraws from the system prior to retirement, the award should include the health insurance premium that would have been paid on behalf of the plaintiff, which is $474.96 and which brings the total award to $23,-374.88. No further adjustments would be appropriate since they are too speculative in nature and not supported by the record, but the Court has previously determined that prejudgment interest should be allowed based on the equities of the case.

## II. *Reinstatement*

 The plaintiff is seeking reinstatement to his position as band director because his present position is at a significantly decreased salary, or, alternatively, he requests an award of front pay for a period of five years based on the difference between his present salary and the salary he would have received but for the defendants' illegal discrimination. Reinstatement would, however, result in displacement of an innocent third party who is presently the band director. Although a presumption exists in favor of reinstatement as an equitable remedy, *Gutzwiller, supra*, at 1333, reinstatement is inappropriate where either it would result in displacement of an innocent third party, *Shore v. Federal Express Corp.*, 777 F.2d at 1158, or where the plaintiff has found other similar work, *Henry v. Lennox Industries*,

---

**2.** The Court does note that in *Gutzwiller*, the Sixth Circuit ordered reinstatement of a non-tenured college teacher but refused to order reinstatement with tenure. 860 F.2d at 1333.

768 F.2d at 753. In the present case, both of these conditions exist, making reinstatement inappropriate.[3] The United States Supreme Court in *Ford Motor Company*, 458 U.S. at 239–240, 102 S.Ct. at 3069–70, expressly noted that the adverse effect of a Title VII remedy on an innocent third party should be weighed by the district court.

■ The Court must next consider whether front pay is an appropriate equitable remedy in this case. *Gutzwiller, supra*, at 1333. For the same reasons that the Court does not find an additional back pay award appropriate, given that the plaintiff's reasonable expectation of employment cannot extend beyond the 1982–1983 contract year, any award of front pay would also be based upon speculation. No *per se* rule on front pay exists and, as it presently stands, the award of back pay plus prejudgment interest fully compensates the plaintiff. This award is substantial and "will aid in ending illegal discrimination and rectifying the harm it causes." *Shore*, at 1159.

The Court, therefore, awards the plaintiff an additional amount of $474.96 in back pay. No reduction of the total award for failure to mitigate or to exercise due diligence is supported by the record in this case.

Accordingly, the Court ORDERS:

1. That the plaintiff's motion to alter or amend the judgment [docs. 42, 42A] is GRANTED IN PART and the Court AWARDS the plaintiff an additional sum of $474.96, bringing the total award in this case to $23,374.88, with prejudgment interest calculated on this amount from January 7, 1987;

2. The defendants' motion for relief from the judgment [docs. 46, 46A] is DENIED; and

3. The plaintiff's attorney is DIRECTED to file his lodestar affidavit for additional attorney's fees, which accrued subsequent to the initial affidavits already filed in this case, by 5:00 p.m., Tuesday, October 10, 1989. The Court will then consider the appropri-

ate award of attorney's fees in this case.

---

**3.** Further, the Court is not convinced that no remnant hostility exists between these parties.